

FILED

AUG 27 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY DEPUTY CLERK

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  NATURAL RESOURCES DEFENSE
    COUNCIL, et al.,
12                                          NO. CIV. S-88-1658 LKK
              Plaintiffs,
13                                               O R D E R
         v.
14                                          **TO BE PUBLISHED**

15  ROGER PATTERSON, etc., et al.,

16            Defendants.
    _____/
17

18       This matter comes before the court on plaintiffs' motion for

19  summary adjudication as to liability on their claim under

20  § 8 of the Reclamation Act of 1902.  Plaintiffs allege that since

21  the late 1940s, the Department of Interior's Bureau of Reclamation

22  has failed to release the amount of water through the Friant Dam

23  required to keep the San Joaquin River historic fisheries in good

24  condition.  The Friant defendants and the Chowchilla Water District

25  bring cross-motions for summary adjudication and for dismissal in

26  which the Madera Irrigation District joins.  California's State

Water Resources Control Board (SWRCB), the Central Delta Water Agency and South Delta Water Agency, and Waterkeepers Northern California and Deltakeeper, have all filed *amicus* briefs in favor of plaintiffs' motion and in opposition to the Friant defendants' motion.[1]

## I.

### UNDISPUTED FACTS

**A.   THE SAN JOAQUIN RIVER BEFORE FRIANT DAM**

The San Joaquin River is the main artery of California's second largest river system.   The river originates high in the Sierra Nevada mountains, on mountain peaks southeast of Yosemite National Park, and then tumbles westward out of the mountains and into the trough of the Central Valley.   Near the city of Mendota, the River turns abruptly north for the final stretch of its several hundred mile journey, picking up the Merced, Tuolumne, Stanislaus, Mokelumne, Calaveras, and Cosumnes Rivers as major tributaries on the way. It finally merges with the Sacramento River to form the San Francisco Bay-Delta estuary.

Historically, the San Joaquin River supported substantial populations of Chinook salmon, including both a fall and a spring run (Decl. of Peter Moyle, Exh. F, at 16).   Chinook are distinguishable from other species of Pacific salmon by their large size and unique markings.   They are an anadromous species, which

_____

[1]   The federal defendants have filed a "Motion that the Court Deny Plaintiffs' Motion for Summary Judgment."   The court construes defendants' motion as an opposition to plaintiffs' motion.

means that they emerge and rear in freshwater tributaries, migrate to the ocean as juveniles, and return to their natal waters to spawn two to four years later.  The San Joaquin River's adult spring-run Chinook historically returned to the River mostly during the months of March through June, and spent the summer holding in deep pools above and below the existing location of Friant Dam. Spring-run would then spawn in the early fall, and their offspring would migrate out to the sea the following year, generally from January to March.  Historically, the adult fall-run Chinook returned to the river mostly between September and December, and spawned soon thereafter.  Fall-run juveniles would emerge in late winter and migrate out to the sea primarily in the months of March through May.

Salmon on the San Joaquin River were abundant prior to the closure of Friant Dam (Moyle Decl., ¶ 1; Decl. of Amy Macaux, Exh. F, at 16).  The river's spring run was one of the largest Chinook runs anywhere on the Pacific Coast and has been estimated at several hundred thousand fish (Moyle Decl., ¶ 20; Macaux Decl., Exh. G, at 9; Macaux Decl., Exh. F, at 8).  The historical fall run is conservatively estimated to have numbered 50,000 to 100,000 fish.  So many salmon migrated up the San Joaquin River during the spawning season that some people who lived near the present site of Friant Dam compared the noise to a waterfall.  Some residents even said that they were kept awake nights by the myriad salmon heard nightly splashing over the sand bars in the River.  One observer reported that salmon were so plentiful that ranchers

trapped the fish and fed them to hogs.  A fisherman who lived downstream recalls that, in the 1940s, the salmon were still "so thick that we could have pitch-forked them.  One almost could have walked across the River on the backs of the salmon when they were running."  (Decl. of John Banks, ¶ 5).

The upper San Joaquin River contained Chinook habitat both above and below the location of Friant Dam, including some of the best spring-run habitat anywhere in California.  This included a mixture of deep pools for holding and gravelly riffles for spawning, over which cold water ran.  (Moyle Decl., ¶ 19).  Much of that habitat still survives in the River below Friant Dam. (Id.)  Other anadromous fish, including Pacific lamprey and steelhead, once lived on the San Joaquin River below Friant Dam as well.  (Moyle Decl., ¶ 22; Macaux Decl., Exh. G, at 1,9; Wall Decl., Exh. B., at 29-32).  Collections of fish made in the vicinity of Friant in 1898 and 1934 indicate that the River supported diverse native fish that included rainbow trout, splittail, hitch, hardhead, and Kern brook lamprey, all species of conservation interest today.  The river's flow into the Delta also helped support that important ecosystem's water quality and habitat.  In 1999, the National Marine Fisheries Service designated the San Joaquin River between Friant Dam and the Merced as "essential fish habitat" for Chinook salmon, pursuant to the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-83 (Decl. of Michael E. Wall, Exh. A; RJN, Exh. A).

////

4

**B.    THE BUILDING OF FRIANT DAM**

The Bureau built Friant Dam across the upper San Joaquin River, northwest of Fresno, in the early 1940s as part of the Central Valley Project.  Construction began in 1939 and was largely completed by the mid-1940's.  The Dam stores the river's flow in Millerton Lake, the reservoir behind the Dam, and diverts water for irrigation and other purposes into two canals. The first of these, the Madera Canal, was completed in 1945. The second, the Friant-Kern Canal, began delivering water by 1949.  Since that time, the Bureau has operated Friant Dam to maximize the quantity of water diverted to its Friant Division contractors, including the non-federal defendants.

Friant Dam blocked upstream access to a portion of the San Joaquin River's spawning habitat for salmon and steelhead; however, it was not the construction of the Dam that terminated the salmon runs.  For several years after Friant Dam was in place, the Bureau released sufficient water to sustain the salmon fishery.  Chinook salmon are a remarkably resilient species, and although Friant Dam blocked passage to upstream habitat, during the first years after the Dam was built, spring-run Chinook successfully held in pools below Friant Dam during the summer months, adults successfully spawned in habitat below the Dam, and juveniles continued to migrate downstream.  In one of these years, 1945, an estimated 56,000 spring-run returned to spawn below Friant Dam.  While the upper San Joaquin's salmon runs were not as strong as they once were, Professor G.H. Clark,

1  of Stanford University, reported that the fish themselves were
2  "in excellent shape" in 1942 (Decl. of Adam Wolf, Exh. F).

3  By the late 1940s, however, the Bureau's operation of
4  Friant Dam had caused long stretches of the River to dry up.
5  (Macaux Decl., Exh. F, at 18).  In the spring of 1948, the
6  California Division of Fish and Game responded with a dramatic
7  fish rescue in an attempt to save the River's spring-run Chinook
8  salmon.  About 2,000 up-migrating Chinook were trapped in the
9  lower portion of the River, hauled by truck around the de-
10 watered stretch of the River, and released at a point from which
11 they could migrate upstream to deep pools just below Friant Dam.
12 These salmon were able to hold over the summer in these pools,
13 and to spawn successfully below Friant Dam in the fall, but
14 their offspring perished in early 1949 when they attempted to
15 out-migrate through the dried-up River bed.

16 With the completion of the Friant-Kern Canal, the Bureau in
17 1949 further increased diversions, leaving even less water for
18 the San Joaquin River. (Moyle Decl., ¶ 31; Macaux Decl., Exh. J,
19 at 6).  The last of the upper San Joaquin River's fall-run
20 Chinook salmon were reported in a pool below Mendota Dam in
21 1949. (Loudermilk Decl., Exh. K).  Spring-run Chinook salmon
22 disappeared from the San Joaquin River after unsuccessful salmon
23 rescue attempts in 1949 and 1950. (Moyle Decl., ¶ 39; Macaux
24 Decl., Exh. F., at 18; Macaux Decl., Exh. G, at 9).  For most of
25 the last 50 years, the Bureau has diverted virtually all of the
26 River's flows.  (Macaux Decl., Exh. J, at 6; Macaux Decl., Exh.

K, at 3; Moyle Decl., ¶¶ 22-28, 31; Loudermilk Decl., ¶ 2).
While salmon continued to return and spawn until 1949, after
that, "the San Joaquin chinook was extirpated in its
southernmost range." (Macaux Decl., Ex F, at 18).

Some sixty miles of the River upstream of its confluence
with the Merced now lie continuously dry, except during rare
flood events.  (Macaux Decl., Exh. E, at 7; Macaux Decl., Exh.
K, at 3; Wall Decl., Exh. B, at 43; Loudermilk Decl., ¶ 2).  The
spring-run Chinook – once the most abundant race of salmon in
the Central Valley – appear to have been extirpated from the
length of the River. (Wall Decl., Exh. B, at 36, 42, 48; Macaux
Decl., Exh. H, at 9).  Small populations survive only in the
Sacramento River system.  (Moyle Decl., ¶¶ 26, 29).  The fall-
run Chinook, too, were eliminated from the upper San Joaquin
River, although reduced populations of fall-run Chinook survive
on downstream tributaries, principally the Merced, Tuolumne, and
Stanislaus Rivers.  (Moyle Decl., ¶ 27; Wall Decl., Exh. B, at
36, 42, 48; Macaux Decl., Exh J at 6).  In the words of the
Department of the Interior, Friant Dam's operations have been a
"disaster" for Chinook salmon.  United States Dep't of the
Interior, *The Relationship Between Instream Flow, Adult*
*Immigration, and Spawning Habitat Availability for Fall-Run*
*Chinook Salmon in the Upper San Joaquin River, California* at 6
(Sept. 1994) (Macaux Decl., Exh. J).

Despite the upper San Joaquin River's degraded habitat and
long stretches of normally dry river bed, salmon and Pacific

1   lamprey have returned to the upper San Joaquin River in wet
2   years, even after Friant Dam began full storage and diversion
3   operations.   Part of Chinook salmon's natural behavior includes
4   establishing or re-establishing themselves in new streams and
5   rivers by "straying" from their natal waters.  (Moyle Decl.,
6   ¶ 33).   In some years, salmon have made it to the base of Friant
7   Dam.  (Moyle Decl., ¶ 33; Macaux Decl., Exh. G, at 10).
8   Adequate flows of water have not been released from Friant Dam
9   for these up-migrating salmon to spawn, however, or for their
10  offspring to migrate back to the sea.  (Moyle Decl., ¶ 33;
11  Loudermilk Decl., ¶ 2; Wall Decl., Exh. B, at 29, 35-36).

12      The Bureau's operation of Friant Dam has also contributed
13  significantly to declines in other native fish throughout the
14  San Joaquin River system.  (Moyle Decl., ¶ 22, 31; Macaux Decl.,
15  Exh. G, at 1-2; Wall Decl., Exh. B, at 42-43).  Following the
16  construction of Friant Dam, ten of the sixteen species of native
17  fish disappeared from the area.  (Moyle Decl., ¶ 22; Macaux
18  Decl., Exh. G, at 1-2).  They were replaced, in the reaches
19  where enough water for any fish still exists, primarily by a
20  variety of non-native fishes. (Moyle Decl., ¶ 22; Macaux Decl.,
21  Exh. E, at 6-7).

22      Waters from the upper San Joaquin had been critical to
23  providing habitat for fish species many miles below the Dam.
24  (Moyle Decl., ¶ 31; Macaux Decl., Exh. G, at 1).  San Joaquin
25  River flows are needed to help attract adult salmon to their
26  spawning grounds, to provide habitat for young and juvenile

1  salmon, to move juvenile salmon downstream in the spring through

2  the lower San Joaquin River, and to provide sufficient dilution

3  of toxic and saline drainage to maintain a minimum level of

4  water quality. (Moyle Decl., ¶ 31; Macaux Decl., Exh. E, at

5  10). Failure to release water from Friant Dam has rendered many

6  miles of fish habitat unusable, especially in the stretch

7  between the Dam and the river's confluence with the Merced, and

8  has also adversely affected water quality along the whole course

9  of the river. (Moyle Decl., ¶ 31; Macaux Decl., Exh. G, at 1,

10  2; Wall Decl., Exh. B, at 44, 46). Today, the first several

11  miles of the San Joaquin River deep water ship channel, near

12  Stockton, experience dissolved oxygen levels that are so low

13  during summer and fall months that they do not meet the state

14  water quality objective. (Wall Decl., Exh. C, at 1). Low

15  dissolved oxygen in these reaches poses a danger to fish

16  generally, and a migration barrier to anadromous fish, including

17  salmon in particular. Id.

18      Reduced flows in the San Joaquin below Friant Dam have

19  diminished the area available for fish, increased the

20  temperature of the water that is available, reduced the ability

21  of the river to assimilate agricultural runoff and other

22  pollutants, and substantially degraded riparian vegetation.

23  (Moyle Decl., ¶ 31; Wall Decl., Exh. B, at 46; Macaux Decl.,

24  Exh. G, at 6). Native fishes such as hitch, splittail, tule

25  perch, and pikeminnow, have largely disappeared from the River

26  and have been replaced by exotic fishes tolerant of warm

1 polluted water.  PSUF 66.  The present warm-water fishery that
2 exists on portions of the San Joaquin River between Mendota Pool
3 and the San Joaquin's confluence with the Merced River is small
4 and erratic. (Moyle Decl., ¶ 32).  Many of the fish in this
5 reach are contaminated with pesticides and other agricultural
6 contaminants. (Moyle Decl., ¶ 31; Wall Decl., Exh. B., at 35).
7 From Mendota Pool to Sack Dam, the river is basically used to
8 convey irrigation water, and from Sack Dam to the river's
9 confluence with the Merced River, the river is dewatered for
10 forty miles until agricultural drain water provides a small flow
11 that is a highly degraded environment for fish. (Moyle Decl.,
12 ¶ 31; Macaux Decl., Exh. G, at 6).  Surveys by the U.S.
13 Geological Survey indicate that the fish in this polluted
14 section of the river are almost entirely pollution-tolerant non-
15 native fishes, such as common carp, red shiners, bluegill, and
16 mosquito fish (Macaux Decl., ¶ 32).  The native fish have
17 largely disappeared.

18                                 **II.**

19                    **SUMMARY ADJUDICATION STANDARDS**

20      Summary adjudication, or partial summary judgment "upon all
21 or any part of a claim," is appropriate where there is no genuine
22 issue of material fact as to that portion of the claim.  <u>Lies v.</u>
23 <u>Farrell Lines, Inc.</u>, 641 F.2d 765, 769 (9th Cir. 1981) ("Rule 56
24 authorizes a summary adjudication that will often fall short of a
25 final determination, even of a single claim") (citations omitted);
26 <u>Playboy Enters., Inc. v. Welles, Inc.</u>, 78 F. Supp. 2d 1066, 1073

1  (S.D. Cal. 1999), aff'd in part, rev'd in part, on other grounds,

2  279 F.3d 796 (9th Cir. 2002); E.D. Local Rule 56-260(f).

3       Under summary judgment practice, the moving party

> always bears the initial responsibility of
> informing the district court of the basis for
> its motion, and identifying those portions of
> 'the  pleadings,  depositions,  answers  to
> interrogatories,  and  admissions  on  file,
> together with the affidavits, if any,' which
> it believes demonstrate the absence of a
> genuine issue of material fact.

9  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

10 nonmoving party will bear the burden of proof at trial on a

11 dispositive issue, a summary judgment motion may properly be made

12 in reliance solely on the 'pleadings, depositions, answers to

13 interrogatories, and admissions on file."  Id.  Indeed, summary

14 judgment should be entered, after adequate time for discovery and

15 upon motion, against a party who fails to make a showing sufficient

16 to establish the existence of an element essential to that party's

17 case, and on which that party will bear the burden of proof at

18 trial.  See id. at 322.  "[A] complete failure of proof concerning

19 an essential element of the nonmoving party's case necessarily

20 renders all other facts immaterial."  Id.  In such a circumstance,

21 summary judgment should be granted, "so long as whatever is before

22 the district court demonstrates that the standard for entry of

23 summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

24 at 323.

25      If the moving party meets its initial responsibility, the

26 burden then shifts to the opposing party to establish that a

1  genuine issue as to any material fact actually does exist.

2  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

3  586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

4  391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

5      In attempting to establish the existence of this factual

6  dispute, the opposing party may not rely upon the denials of its

7  pleadings, but is required to tender evidence of specific facts in

8  the form of affidavits, and/or admissible discovery material, in

9  support of its contention that the dispute exists. See Fed. R.

10  Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First

11  Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954

12  (9th Cir. 1998). The opposing party must demonstrate that the fact

13  in contention is material, i.e., a fact that might affect the

14  outcome of the suit under the governing law, Anderson v. Liberty

15  Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169,

16  Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th

17  Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec.

18  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

19  dispute is genuine, i.e., the evidence is such that a reasonable

20  jury could return a verdict for the nonmoving party, Anderson, 477

21  U.S. 248-49; see also Cline v. Industrial Maintenance Engineering

22  & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

23      In the endeavor to establish the existence of a factual

24  dispute, the opposing party need not establish a material issue of

25  fact conclusively in its favor. It is sufficient that "the claimed

26  factual dispute be shown to require a jury or judge to resolve the

1  parties' differing versions of the truth at trial." First Nat'l

2  Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.

3  Thus, the "purpose of summary judgment is to 'pierce the pleadings

4  and to assess the proof in order to see whether there is a genuine

5  need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R.

6  Civ. P. 56(e) advisory committee's note on 1963 amendments); see

7  also International Union of Bricklayers & Allied Craftsman Local

8  Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.

9  1985).

10      In resolving the summary judgment motion, the court examines

11  the pleadings, depositions, answers to interrogatories, and

12  admissions on file, together with the affidavits, if any. Rule

13  56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093

14  (9th Cir. 1999). The evidence of the opposing party is to be

15  believed, see Anderson, 477 U.S. at 255, and all reasonable

16  inferences that may be drawn from the facts placed before the court

17  must be drawn in favor of the opposing party, see Matsushita, 475

18  U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,

19  655 (1962)(per curiam)); See also Headwaters Forest Defense v.

20  County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000).

21  Nevertheless, inferences are not drawn out of the air, and it is

22  the opposing party's obligation to produce a factual predicate from

23  which the inference may be drawn. See Richards v. Nielsen Freight

24  Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d

25  898, 902 (9th Cir. 1987).

26  ////

1   Finally, to demonstrate a genuine issue, the opposing party

2   "must do more than simply show that there is some metaphysical

3   doubt as to the material facts. . . . Where the record taken as a

4   whole could not lead a rational trier of fact to find for the

5   nonmoving party, there is no 'genuine issue for trial.'"

6   Matsushita, 475 U.S. at 587 (citation omitted).

7                                    III.

8                                  ANALYSIS

9   A.   INTRODUCTION

10   As this court has previously held, and as explained in

11   greater detail below, § 8 of the Reclamation Act of 1902,[2] makes

12   California Fish and Game Code § 5937[3] applicable to the federal

13   defendants in this case. Plaintiffs' first claim is

14   _____

15   [2]   Section 8 provides:

16      Nothing in this Act shall be construed as affecting or
        intended to affect or to in any way interfere with the
17      laws of any State or Territory relating to the control,
        appropriation, use, or distribution of water used in
18      irrigation, or any vested right acquired thereunder, and
        the Secretary of the Interior, in carrying out the
19      provisions of this Act, shall proceed in conformity with
        such laws . . . .
20

21   43 U.S.C. § 383.

22   [3]   That statute provides:

23      The owner of any dam shall allow sufficient water at all
        times to pass through a fishway, or in the absence of a
24      fishway, allow sufficient water to pass over, around or
        through the dam, to keep in good condition any fish that
25      may be planted or exist below the dam.

26   Cal. Fish and Game Code § 5937.

                                     14

1  premised on § 5937.  Plaintiffs allege that the Bureau of
2  Reclamation, since the 1940's, has failed to "allow sufficient
3  water" to "pass over, around or through the dam, to keep in good
4  condition any fish that may be planted or exist below the dam."

5       In California v. United States, 438 U.S. 645 (1978), the
6  Supreme Court explained that the "cooperative federalism" mandated
7  by  § 8 required the United States to comply with state water laws
8  unless that law was directly inconsistent with clear congressional
9  directives regarding the project. Id. at 650, 678; see id. at 653
10 ("The history of the relationship between the Federal Government
11 and the States in the reclamation of the arid lands of the Western
12 States is both long and involved, but through it runs the
13 consistent threat of purposeful and continued deference to state
14 water law by Congress.").  Thus, absent displacement by another
15 federal statute, § 8 requires the Bureau of Reclamation to comply
16 with § 5937.  See NRDC v. Houston, 146 F.3d 1118, 1132 (9th Cir.
17 1988).

18      In their motion for summary adjudication, plaintiffs ask this
19 court to find that the federal defendants have violated § 8 and
20 § 5937, but to reserve the question of remedy for a subsequent
21 phase of the litigation.

22      In their oppositions to plaintiffs' motion, and in their own
23 motions, the defendants argue, inter alia, that (1) plaintiffs lack
24 standing (2) the court lacks subject matter jurisdiction to
25 entertain plaintiffs' claim under the Administrative Procedure Act,
26 (3) the State Water Resources Board has addressed the issue and the

1  Board's decision is entitled to preclusive effect, and (4)

2  plaintiffs' claim is preempted by the Central Valley Project

3  Improvement Act.

4      This litigation was commenced in 1988.  While much of that

5  time was taken up by efforts to reach a good faith settlement,

6  this court has invested a substantial amount of time over the

7  past fifteen years resolving the many subtle and complex legal

8  issues raised by this lawsuit and by the § 8/§ 5937 claim in

9  particular.  Many of the arguments raised by the defendants have

10 been previously litigated and have resulted in decisions, both

11 by this court and by the U.S. Court of Appeals for the Ninth

12 Circuit.  In that regard, the court has previously warned the

13 parties against continually relitigating such issues. See Status

14 (Pretrial Scheduling) Order filed Sept. 27, 1995, at 2

15 (admonishing the parties not to include "disguised motions to

16 reconsider legal issues this court has already decided" in their

17 summary judgment motions).  Unfortunately, that admonition has

18 not affected the defendants' conduct.  I thus now must reiterate

19 that the court's previous rulings are law of the case, and may

20 not now be reopened or relitigated.  See, e.g., Pitt River Home

21 & Agric. Co-op. v. United States, 30 F.3d 1088, 1096-97 (9th

22 Cir. 1994) (holding that "[t]he law of the case rule ordinarily

23 precludes a court from re-examining an issue previously decided

24 by the same court, or a higher appellate court, in the same

25 case" (internal quote marks and citations omitted)); see also

26 Vizcaino v. United States Dist. Ct., 173 F.3d 713, 719 (9th Cir.

1  1999) (explaining that, under the law of the case doctrine,

2  parties may not relitigate issues that either have been

3  previously decided in the same case or that the parties "have

4  already had a fair opportunity to contest").  In sum, where an

5  issue has been decided, the court will not revisit the question

6  unless changed law or circumstances warrant it.

7  **B.    STANDING AND SUBJECT MATTER JURISDICTION**

8      **1.    <u>Article III Standing</u>**

9      Defendants' challenge to plaintiffs' Article III standing

10  is effectively foreclosed by the law of the case doctrine.  In

11  January 1992, the defendants moved to dismiss the plaintiffs'

12  § 8/§ 5937 claim.  Among other contentions, the federal

13  defendants asserted that "the plaintiffs lack standing to bring

14  this claim because their alleged injury does not fall within the

15  zone of interest [*sic*] protected by Section 8."  Fed. Defs.'

16  Mem. in Supp. of Mot. to Dismiss Plfs.' 4th Claim at 1-2 (filed

17  Jan. 6, 1992).

18      In a published order filed on April 30, 1992, this court

19  denied the defendants' motions to dismiss, finding that the

20  plaintiffs have both constitutional and statutory standing to

21  enforce § 8 and § 5937.  <u>See</u> <u>NRDC v. Patterson</u>, 791 F.Supp. at

22  1425, 1430-31 (E.D. Cal. 1992).  I explained that "[p]laintiffs'

23  groups are composed of would-be users of the water and water-

24  generated resources that would result if the Bureau were

25  required to [comply] . . . with the provisions of § 5937," that

26  the plaintiffs had alleged an injury in fact, and that the

1  plaintiffs "plainly" fell within the zone of interests

2  implicated by § 8 and § 5937.  Id. at 1429-31.  There has been

3  no change in facts or circumstances that warrants revisting the

4  1992 conclusions.[4]  The undisputed facts establish that

5  plaintiffs have standing with respect to their first claim, and

6  the court's previous finding with respect to standing is

7  therefore confirmed.

8      2.   **Judicial Review under the APA**

9      Plaintiffs' first claim is brought pursuant to § 706(1) of

10  the Administrative Procedure Act ("APA"), which authorizes

11  claims to "compel agency action unlawfully withheld or

12  unreasonably delayed." 5 U.S.C. § 706(1).  Both the federal

13  defendants and the Friant defendants argue that this court lacks

14  subject matter to hear plaintiffs' claim because, under the

15  Supreme Court's recent decision in Norton v. Southern Utah

16  Wilderness Alliance, 124 S.Ct. 2373 (June 14, 2004) ("SUWA"),

17  § 706(1) does not authorize judicial review of claims such as

18  those at bar.

19     In SUWA, various environmental groups brought suit under

20  § 706(1), alleging that the Bureau of Land Management (BLM) failed

21  to act to protect Utah public lands from environmental damage

22  caused by off-road vehicles.  The High Court held that "a claim

23

_____

24      [4]  The defendants' disregard of the court's order has caused
   plaintiffs to submit additional affidavits demonstrating standing
25  on the part of current individual members of plaintiff
   organizations.  See, e.g., Decl. of Barry Nelson, ¶¶ 6-9; Decl. of
26  John Banks, ¶¶ 9-10; Decl. of Nick Di Croce, ¶¶ 4-5.

1  under § 706(1) can proceed only where a plaintiff asserts that an

2  agency failed to take a *discrete* agency action that it is *required*

3  *to take*."   124 S.Ct. at 2379 (emphasis in original).   "The

4  limitation to discrete agency action," the Court explained,

5  "precludes the kind of broad programmatic attack we rejected in

6  <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871 (1990)."  124

7  S.Ct. at 2379-80.[5]  "The limitation to *required* agency action rules

8  out judicial direction of even discrete agency action that is not

9  demanded by law."  <u>Id.</u> at 2380.

10      The Friant and federal defendants contend that the limitations

11  addressed in <u>SUWA</u> bar the § 8/§ 5937 claim at issue here.

12  Evaluation of this argument requires a comparison of the sort of

13  "broad programmatic attack" rejected in <u>National Wildlife</u>

14  <u>Federation</u> and <u>SUWA</u>, and in Ninth Circuit cases applying the same

15  principles, with the claim at issue here.

16      In <u>SUWA</u>, the plaintiffs alleged three different failures to

17  act on the part of the BLM, premised on different statutory and

18  regulatory provisions.  First, the plaintiffs claimed that the BLM

19  had violated a statute requiring the Secretary of the Interior to

20  _____

21      [5]   In <u>National Wildlife Federation</u>, the Court considered a
    challenge to BLM's land withdrawal review program, which the
22  plaintiff cast as unlawful agency "action" that should be "set
    aside" under § 706(2) of the APA.  The Court rejected this
23  challenge, explaining that the plaintiff "cannot seek *wholesale*
    improvement of this program by court decree, rather than in the
24  offices of the Department or the halls of Congress, where
    programmatic improvements are normally made.  Under the terms of
25  the APA, [plaintiff] must direct its attack against some particular
    'agency action' that causes it harm."   <u>National Wildlife</u>
26  <u>Federation</u>, 497 U.S. at 891.

manage certain wilderness study areas "so as not to impaire the[ir] suitability for preservation as wilderness." 43 U.S.C. § 1782(c). The Court found that the statute was "mandatory as to the object to be achieved, but it leaves to BLM a great deal of discretion in deciding how to achieve it."  Such an alleged general deficiency in compliance, the Court held, lacked the requisite specificity. Slip op. at 9-11.  Second, the plaintiffs claimed that the BLM's failure to comply with provisions of its land use plans contravened the requirement that the Secretary of the Interior manage public lands in accordance with such plans.  43 U.S.C. § 1732(a).  This claim was not actionable, the Court reasoned, because a land use plan, unlike a specific statutory command, is generally a statement of priorities; it guides and restrains actions, but does not prescribe them.  Thus, such statements are not legally binding commitments enforceable under § 706(1).  Slip op. at 11-16.  Third, the plaintiffs in SUWA argued that the BLM failed to fulfill certain obligations under the National Environmental Protection Act ("NEPA"); the Court disposed of this claim without resort to the principles at issue here.

The limitations described in SUWA and Lujan are important ones. They are designed to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." Id. at 10.  They are, however, simply inapplicable here. Directly put, § 8 requires the Secretary to "proceed in conformity" with the relevant state laws,

1   43 U.S.C. § 383, and the relevant state law here directs the Bureau

2   to release sufficient water to "reestablish and maintain" the

3   "historic fisheries." <u>CalTrout II</u>, 218 Cal.App.3d at 210, 213.

4   This kind of specific legal duty is a far cry from the general

5   statutory directive that the government endeavor to manage certain

6   of its lands "so as not to impaire the[ir] suitability for

7   preservation as wilderness." 43 U.S.C. § 1782(c).   Rather, the

8   "plaintiff[s] assert that an agency failed to take a *discrete*

9   agency action that it is *required to take*." <u>SUWA</u>, 124 S. Ct. at

10  2379 (emphasis in original).   The Court's decision in <u>SUWA</u>,

11  therefore, does not affect the plaintiffs' claim, which is that the

12  federal defendants' failure to comply with § 5937's command is

13  actionable under APA § 706.[6]

14  **C.   APPLICABILITY OF SECTION 5937 TO FRIANT DAM**

15      The federal defendants once again argue that § 5937 does

16  not apply to the Friant Dam.   In their January 1992 motion to

17  _____

18      [6] In their supplemental letter briefs, the parties argue over the precise scope of the limitation on APA § 706(1) challenges announced in <u>SUWA</u>.   The federal defendants' letter brief cites <u>ONRC</u>

19  <u>Action v. Bureau of Land Management</u>, 150 F.3d 1132 (9th Cir. 1998), for the proposition that plaintiffs must "point to a deliberate

20  decision by [the agency] to act or not to take action."   <u>Id.</u> at 1137; <u>Sierra Club v. Peterson</u>, 228 F.3d 559, 569 (5th Cir. 2000)

21  ("Under the APA, the district court only had jurisdiction over challenges to identifiable final agency actions.").   This argument,

22  while quite interesting, seems to have little to do with the matter at bar.   Here, the plaintiffs have pointed to a specific statutory

23  requirement, § 8 incorporating § 5937, which they assert requires the Government to release sufficient water to keep the fish in good

24  condition.   In addition, they point to specific, albeit repeated, instances in which the government decided not to act, i.e. not to

25  release sufficient water to keep the fish in good condition.   Thus, it appears clear that this court possesses jurisdiction over

26  plaintiffs' claim.

1 dismiss, the federal defendants also argued that § 5937 "does

2 not apply to Friant Dam" as a matter of state law, that § 5937

3 "is inconsistent with clear Congressional directives and thus

4 may not be applied to Friant Dam," and that "[s]ection 5937 is

5 simply not a statute that is included within Section 8's

6 mandate."  Fed. Defs.' Mem. in Supp. of Mot. to Dismiss Plfs.'

7 4th Claim at 1, 2, 10 (filed Jan. 6, 1992).  In a parallel

8 motion, the non-federal defendants likewise argued that § 5937

9 "is not one of the laws to which Congress directed or intended

10 that the [Bureau] comply when carrying out its responsibilities

11 under the 1902 Federal Reclamation Act," and urged the court to

12 "invoke the abstention doctrine to stay further federal court

13 proceedings."  Non-Fed. Defs.' Mot. to Dismiss Plfs.' 4th Claim

14 at 1, 19 (filed Jan. 6, 1992); Non-Fed. Defs.' Reply to Opp. to

15 Mot. to Dismiss Plfs.' 4th Claim at 10 (filed Feb. 21, 1992).

16 This court's April 1992 published order rejected these

17 arguments, holding that § 5937 "relates to the control,

18 appropriation, use or distribution of water used in irrigation,"

19 and therefore that the state statute "must be held to be within

20 the purview of state laws made applicable to the Bureau through

21 Section 8 [of the Reclamation Act of 1902.]"  Patterson, 791

22 F.Supp. at 1433, 1435.  "Section 8," this Court squarely held,

23 "mandates compliance with the state statute."  Id. at 1435.

24 Defendants have identified no change in facts or circumstances

25 that warrants revisiting the court's prior ruling.

26 ////

1  D.    **WHETHER § 5937 ESTABLISHES ALTERNATIVE REQUIREMENTS**

2         Section 5937 provides that "[t]he owner of any dam shall allow

3  sufficient water at all times to pass through a fishway, or in the

4  absence of a fishway, allow sufficient water to pass over, around

5  or through the dam, to keep in good condition any fish that may be

6  planted or exist below the dam."  The Friant defendants argue that

7  this language sets forth alternative requirements for the release

8  of water.  The phrase "any fish that may be planted *or* exist below

9  the dam," they contend, when given its usual, ordinary, meaning,

10 should be read to require a dam owner to release enough water from

11 the dam to "keep" – that is, to maintain in good condition – *either*

12 "any fish that may be planted" *or*, in the alternative, "any fish

13 that may . . . exist below the dam."    Plaintiffs, they argue,

14 improperly read "any" as if it meant "all," and "or" as if it meant

15 "and."    Defendants cite case law which stands for the proposition

16 that the word "or" in a statute must be read in the disjunctive,

17 i.e., the word indicates the legislature's intention to designate

18 alternative categories.   See, e.g., Wards Cove Packing Corp. v.

19 National Marine Fisheries Serv., 307 F.3d 1214, 1219 (9th Cir.

20 2002) ("This language is clear and unambiguous.  It provides that

21 a person that made a legal landing of either halibut or sablefish

22 is qualified to receive an initial QS . . . Under the plain

23 language of Subsection (a)(2), any owner of a fixed gear vessel who

24 made a legal landing of either 'halibut or sablefish' in the

25 regulated area in 1988, 1989 or 1990 is qualified to receive an

26 initial QS in 'halibut and sablefish.'") (interpreting meaning of

1   word "or" in 50 C.F.R. § 679.40(a)(2)); <u>Piscoineri v. City of</u>

2   <u>Ontario</u>, 95 Cal.App.4th 1039, 1044 (2002) ("Such use of the word

3   'or' in a statute indicates an intention to use it disjunctively

4   so as to designate alternative or separate categories.").

5       The principle of statutory interpretation on which defendants

6   rely is not a universal one.  In certain cases, it may make more

7   sense to interpret a phrase including the word "or" as denominating

8   a single category using alternative words, or as a means of

9   emphasis.  <u>See</u>, <u>e.g.</u>, <u>United States v. Olano</u>, 507 U.S. 725, 732

10  (1993) (reading "error or defect" to create one category of

11  "error"), <u>citing</u> <u>United States v. Young</u>, 470 U.S. 1, 15, n. 12

12  (1985); <u>McNally v. United States</u>, 483 U.S. 350, 358- 359 (1987)

13  (second phrase in disjunctive added simply to make the meaning of

14  the first phrase "unmistakable").  Nevertheless, the principle is

15  the conventional default rule.  "Normally, use of a disjunctive

16  indicates alternatives and requires that they be treated separately

17  unless such a construction renders the provision repugnant to the

18  Act."  <u>George Hyman Construction Co. v. Occupational Safety &</u>

19  <u>Health Review Comm'n</u>, 582 F.2d 834, 840, n. 10 (4th Cir. 1978).

20      At oral argument, counsel for *amicus* State Water Resources

21  Control Board offered a common sense solution to the interpretive

22  problem that is both consistent with the default rule of

23  construction and the general purposes of the statute.  The

24  disjunctive language, *amicus* submits, merely "establishes the

25  categories of fish that are to be protected."  Reporter's

26  Transcript at 54:14-15.  The statute does not read "any fish that

may be planted *and* exist below the dam" because there may well not have been any fish planted below the dam.  As counsel for *amicus* observed, "[o]bviously, if there are no planted fish there, there is no duty to protect them." Id. at 55:1-3.  The language of the statute, on this interpretation, is to be read "disjunctively so as to designate alternative or separate categories," Piscoineri, 95 Cal.App.4th at 1044, as defendants suggest, but the alternative categories involved are existential ones; there may be planted fish or there may not be.  Ultimately, however, the statute places a single duty on the dam owner, directing the dam owner to maintain "any fish" that fall into one of two enumerated categories.

The opinion of Justice Blease in California Trout, Inc. v. Superior Court, 218 Cal.App.3d 187 (Cal. Ct. App. 1990), the only California appellate decision to construe § 5937, is entirely consistent with this interpretation.  Cal Trout holds that the statute mandates the reestablishment and maintenance of a dry stream's "historic fishery." Cal Trout, 218 Cal.App.3d at 210. As plaintiffs point out, under the Friant defendants' interpretation, however, the statute would allow a dam owner to achieve compliance by building an aquarium below the dam.  This interpretation would run counter to common sense, the Court of Appeal's decision and to the Legislature's obvious intent.  As Cal. Trout put it, "the Legislature has already balanced the competing claims for water . . . and determined to give priority

////

////

1  to the preservation of their fisheries." <u>Id.</u> at 201.[7]   Thus, the

2  statute's plain meaning, legislative history, and construction by

3  the state's court all point in a single direction and require this

4  court to reject the Friant defendants' proposed interpretation of

5  the statute.

6  **E.   WHETHER THE CVPIA PREEMPTS § 5937**

7      **1.   <u>Prior Rulings</u>**

8      The Central Valley Project Improvement Act (CVPIA) provides

9  that Friant Dam water is not to be released from the Friant Dam

10  to comply with the provisions of the CVPIA regarding the

11  development of a plan to reestablish fish below the Dam.   CVPIA,

12  Pub. L. No. 102-575, § 3406(c)(1), 1992 U.S.C.C.A.N. (106 Stat.)

13  at 4721.

14      In February 1993, the federal defendants filed a motion to

15  dismiss, arguing that the then recently-enacted CVPIA preempted

16  § 5937 as applied to Friant Dam.   The non-federal defendants joined

17  in this motion, and also asserted that original federal

18  authorization of Friant Dam indicated an intent to preempt § 5937.

19  <u>See</u> Non-Fed. Defs.' Reply to Plf.'s Opp. to Fed. and Non-Fed.

20  Defs.' Mots. to Dismiss Plfs.' 4th Amend. Compl. at 20 (filed May

21  24, 1993) ("[F]rom its original planning, construction, and

22  operation, it was always intended that substantial portions of the

23  San Joaquin River would be dry . . . .").

24

25      [7]   It is, of course, true that § 5937's priority must be
reconciled with the purposes of the CVPIA.   As noted in § V of this

26  opinion, however, there is no apparent reason that the statutes
cannot be read as complimentary.

1  This court denied these motions to dismiss in October 1993.

2  Order filed Oct. 12, 1993.  After rejecting the theory that the

3  CVPIA either expressly preempted § 5937 or "occupied the field" so

4  as to displace state law by implication, id. at 31-33, the court

5  considered at length whether § 5937 was in "actual conflict" with

6  the CVPIA.  Id. at 33-45.  After close examination, this court also

7  rejected this preemption theory.  The court explicitly ruled that

8  the CVPIA's requirement that the Secretary of the Interior develop

9  a plan to address fish below Friant Dam "need not preclude

10 application of a state requirement," for "the Secretary's

11 comprehensive plan may be premised upon the Bureau's compliance

12 with section 5937."  Id. at 39.   The court concluded:

13         [C]onsidering the language and structure of the CVP
           Improvement Act and its purpose, the CVP Improvement Act
14         and section 8, insofar as it incorporates section 5937,
           may be reconciled and that both statutory schemes may
15         operate with one another rather than one being
           completely ousted.   Accordingly, this court cannot
16         conclude that plaintiffs' section 8/section 5937 claim
           is preempted.  Because it is not preempted, *application
17         of section 5937 to the Bureau's operation of the Friant
           Dam cannot be deemed inconsistent with congressional
18         directives*, and compliance with its mandate is compelled
           by section 8.

19

20 Id. at 44-45 (emphasis added; citations omitted); see also id. at

21 35 ("[C]ompliance with both the CVP Improvement Act and section

22 5937 is not only possible, but required.").

23     The Ninth Circuit squarely affirmed this court's holdings that

24 § 8 requires compliance with § 5937 and that federal law does not

25 facially preempt § 5937.  See Houston, 146 F.3d at 1131 ("The Non-

26 federal defendants challenge the district court's ruling that

1  § 5937 was not, on its face, preempted by federal law.  We affirm

2  on the facial preemption issue.").   After examining the language

3  and structure of the CVPIA, the Circuit concluded that "[t]here is

4  no clear directive in the CVPIA which preempts the application of

5  § 5937 if the state law could be implemented in a way that is

6  consistent with Congress' plan to develop and restore fisheries

7  below the Friant dam in a manner that is 'reasonable, prudent, and

8  feasible." Id. at 1132 (quoting CVPIA, Pub. L. 102-575, § 3406(c),

9  1992 U.S.C.C.A.N. (106 Stat.) at 4721).[8]

10      **2.   Cal Trout, Houston and CVPIA Preemption**

11      In California Trout, Inc. v. State Water Resources Bd., 207

12  Cal.App.3d 585 (Cal. Ct. App. 1989), the court considered appeals

13  from the dismissal of petitions for writs of mandate to compel the

14  Water Resources Board to rescind two water appropriation licenses

15  issued to Los Angeles, which allowed the diversion of water by

16  means of dams from four creeks.  Plaintiffs contended that the

17  licenses violated Fish and Game Code § 5946, which directed that

18  "[n]o . . . license to appropriate water [in portions of Mono and

19  Inyo Counties] shall be issued . . . after September 9, 1953,

20  unless conditioned upon full compliance with Section 5937."  These

21  provisions, §§ 5946 and 5937, the court observed,

22

23      [8]  It may be that the reasonableness provision of the CVPIA
    ultimately insulates the Bureau from the full rigor of the state
24  statute.  That possibility, however, is a question of remedies, not
    of preemption.  Put somewhat differently, but to the same effect,
25  whatever the reasonableness component of the CVPIA ordains, it is
    clear that complete diversion of the river, with its concomitant
26  destruction of the historical fisheries, is not reasonable.

1     "straightforwardly limit the amount of water that may be

2     appropriated by diversion from a dam in the designated area by

3     requiring that sufficient water first be released to sustain fish

4     below the dam." <u>Id.</u>, 207 Cal.App.3d at 599.

5         The opinion expressly did *not* "reach the question of the

6     application of section 5937 alone as a rule affecting the

7     appropriation of water." Rather, the court held that

8         regardless of the original scope of application of
            section 5937, the purpose of its incorporation into
9         section 5946 is, as section 5946 says, to "condition
            [ ]", and therefore limit, the "appropriat[ion]" of
10        water by the priority given to the preservation of fish
            as set forth in section 5937. Section 5946 provides
11        that "[n]o permit or license to appropriate water in
            District 4 1/2 shall be issued . . . after September 9,
12        1953, unless conditioned upon full compliance with
            Section 5937." One does not show compliance with a rule
13        by claiming that it is inapplicable. Compulsory
            compliance with a rule requiring the release of
14        sufficient water to keep fish alive necessarily limits
            the water available for appropriation for other uses.
15        Where that effects a reduction in the amount that
            otherwise might be appropriated, section 5946 operates
16        as a legislative choice among competing uses of water.

17     <u>Id.</u> at 601.

18         <u>Cal Trout</u> does not explicitly hold that § 5937 mandates

19     placing the preservation of fish above the irrigation purposes of

20     a dam, but reserves the question of the statute's application alone

21     as a rule affecting appropriation of water, separate from § 5946.

22     The court simply interprets the statute, based on its plain meaning

23     and context, as "requiring the release of sufficient water to keep

24     fish alive," without addressing the issue whether that requirement

25     might somehow be limited or conditioned in the context of a larger

26     federal statutory regime.

1    As discussed above, the Supreme Court in <u>California v. United</u>
2  <u>States</u>, 438 U.S. 645 (1978), held that the "cooperative federalism"
3  mandated by § 8 required the federal government to comply with
4  state water laws unless such a law was directly inconsistent with
5  clear congressional directives regarding the project.  <u>Id.</u> at 650,
6  678.  On remand to the Ninth Circuit, that court concluded that the
7  term "congressional directive" meant a preemptive federal statute.
8  <u>United States v. California</u>, 694 F.2d 1171, 1176-77 (9th Cir.
9  1982); <u>see</u> <u>NRDC v. Houston</u>, 146 F.3d 1118, 1132 (9th Cir. 1988).

10    In <u>Houston</u>, as also explained above, the Ninth Circuit
11  addressed and rejected the non-federal defendants' argument that
12  § 5937 is, on its face, preempted by federal law.   The Ninth
13  Circuit's conclusion on this point bears directly on the issue
14  presented in the instant motions.  The court held that "[t]here is
15  no clear directive in the CVPIA which preempts the application of
16  § 5937 if the state law could be implemented in a way that is
17  consistent with Congress' plan to develop and restore fisheries
18  below the Friant dam in a manner that is 'reasonable, prudent, and
19  feasible." <u>Id.</u> at 1132 (<u>quoting</u> CVPIA, Pub. L. 102-575, § 3406(c),
20  1992 U.S.C.C.A.N. (106 Stat.) at 4721).

21    Thus, the question becomes whether the state statute, § 5937,
22  may in fact be implemented in such a way in this case.  That
23  question, as the Ninth Circuit recognized, is not a question of
24  facial incompatibility, but rather one of actual application.  For
25  this reason, the court affirmed on the facial preemption question
26  and left open the question of preemption at the remedy stage.  <u>See</u>

1   <u>id.</u> at 1132 ("it has yet to be determined how much water release

2   would be required under § 5937 and whether that would be consistent

3   with the CVPIA").  Because the instant motions concern only

4   liability under § 5937, such a determination must await the

5   remedial phase of this litigation.

6   **F.   WHETHER THE STATE WATER RESOURCES CONTROL BOARD'S PRIOR
       DECISION PRECLUDES PLAINTIFFS' CLAIM**

7

8   The primary basis for the Friant defendants' motion for

9   summary adjudication, and an important component of the federal

10   defendants' opposition to the plaintiffs' motion, is their position

11   that the plaintiffs' claim is barred by a prior decision of the

12   State Water Resource Control Board known as D-935.  That ruling,

13   they argue, settled the question of whether § 5937 requires the

14   release of additional water from Friant Dam for fish maintenance

15   and protection, and the issue may therefore not be reopened.  As

16   I now explain, for several reasons defendants' argument is not

17   well-taken.

18   **1.   <u>Law of the Case</u>**

19   This court has already ruled that D-935 does not bar

20   plaintiffs' claim.  This ruling is law of the case and may not be

21   relitigated absent a change in law or circumstances.  On July 23,

22   1992, the non-federal defendants filed a motion to dismiss, or in

23   the alternative, to join the Water Resources Control Board as an

24   indispensable party.  The defendants argued that "issuance of an

25   order mandating the release of water from Friant Dam for the

26   purpose of maintaining and preserving fish below the dam" might

1    "conflict" with the water rights permit, known as "D-935," that the
2    State Board had issued for Friant Dam; that an order from this
3    court on the § 8/§ 5937 claim could "impede the Board's ability to
4    determine whether and how § 5937 should be applied"; and finally,
5    that "in the absence of the Board, complete relief cannot be
6    accorded." See Order at 3, 5-6 (filed Jan. 8, 1993).

7        The California Attorney General then filed an *amicus* brief on
8    behalf of the State Board supporting the plaintiffs' right to bring
9    their § 8/§ 5937 claim in this Court.[9]  The State Board explained
10   that   under   California   law,   the   judiciary   has   concurrent
11   jurisdiction to enforce § 5937, see id. at 3-7, and that an order
12   from this court enforcing the federal statute would not conflict
13   with the Board's decision in D-935 for at least two reasons, see
14   id. at 7-9.   D-935, decided in the late 1950s, simply made a
15   determination specific to that time that allowing water to remain
16   for fish was not required in the public interest, but explicitly
17   left open the door for a subsequent proceeding to require enhanced
18   flows to restore salmon.   Id.   Moreover, because D-935 set a
19   *ceiling* on water diversions, not a floor, requiring "compliance
20   with section 5937 would not contravene [the Board's] prior issued
21   permits."   Id.

22       On January 8, 1993, this court rejected the defendants' motion
23   to   dismiss   based   on   the   State   Board's   asserted   exclusive
24   _____

25       [9]   I  cannot  help  but  note  the  irony  of  the  defendants'
     insistence on the sanctity of a decision by the Board which it
26   denies.

1   jurisdiction and prior order.  See Order filed Jan. 8, 1993.   In

2   doing so, the court specifically held that an order requiring "the

3   release of water for enhancement or preservation of in-stream

4   values . . . would not impair or impede D-935 or the Friant

5   Permits."   Id. at 9.   The court further held that, "under

6   California law, the Board does not have exclusive jurisdiction over

7   such decisions."   Id. at 4.   Rather, this Court has jurisdiction

8   over § 8, and given its incorporation of § 5937 and the absence of

9   exclusive Board jurisdiction, this court is empowered to require

10  the Bureau to comply with the state statute's provisions.   Id.

11  Thus, the argument based on the SWRCB's exclusive jurisdiction and

12  prior ruling – the gravamen of the Friant Defendants' motion for

13  summary adjudication – is entirely foreclosed by the law of the

14  case.

15      Even if this court were to decide the question ab initio, the

16  result would be the same.   This is so because (1) D-935 itself did

17  not address the merits of plaintiffs' claim; (2) California law

18  does not confer exclusive jurisdiction on the Board; and (3) the

19  Board's decision is not entitled to preclusive effect under the

20  doctrines of res judicata or collateral estoppel.   The California

21  Attorney General has again submitted an amicus brief on behalf of

22  the State Water Resources Control Board.   The Board adopts each of

23  these three positions.

24      **2.  D-935 Did Not Address Plaintiffs' Claim**

25      First, and perhaps most importantly, this court notes that

26  the State Board decision at issue, D-935, does not so much as

33

1  mention § 5937, let alone provide a ruling on the issue entitled

2  to preclusive weight.  In this regard, it is significant that the

3  State Board disagrees with the defendant's characterization of its

4  ruling.  _See_ _Amicus_ _Curiae_ State Water Resource Control Board's

5  Mem. in Oppo. to Def's Mot. and in Supp. of Pl's Mot. (filed

6  January 22, 2004), at 2 ("The defendant-intervenors have

7  mischaracterized Water Right Decision 935 . . . Decision 935 does

8  not contain _any_ findings or conclusions regarding Section 5937.").

9  As the Board points out:

10         [I]n decision 935, the State Board did not make _any_
           findings  or  render  any  conclusions  regarding
11         Section 5937 of the Fish and Game Code.  If the
           Court reviews the entire 109 pages of Decision 935,
12         the Court will find that the State Board did not at
           any point discussion Section 5937 . . . Indeed, if
13         the Court electronically scanned Decision 935 and
           applied a word search software to the text, the
14         Court would discover that the terms "Fish and Game
           Code"  and  "5937"  do  not  appear  separately  or
15         conjunctively  anywhere  in  the  decision.    The
           defendant-intervenors'  claim  that  Decision  935
16         contains  findings  and  conclusions  regarding  the
           applicability of Section 5937 to the Friant Unit of
17         the  Central  Valley  Project,  is  therefore,  flatly
           wrong.

18

19  _Id._ at 5; _see_ _generally_ _id._ at 4-9; _see_ Amicus State Board's

20  Request for Judicial Notice.[10]  Thus, even if the Board's decision

21  were entitled to preclusive weight, it would be of no moment here,

22  because the Board did not in fact address the issue at hand.

23  ////

24  _____

25         [10]  Amicus State Board has filed a request for judicial notice
       of the full text of Decision 935.  The court grants the request and
26     takes notice of the text of the Decision.

### 3.  Concurrent v. Exclusive Jurisdiction

Second, as noted above, the Board also takes the position that it does not have exclusive jurisdiction over the issues presented here, and that the better course would be to use the procedure of court reference to the agency when and if it becomes necessary to do so.  See *Amicus Curiae* State Water Resource Control Board's Mem. in Oppo. to Def's Mot. and in Supp. of Pl's Mot. (filed January 22, 2004), at  2 ("The defendant-intervenors have improperly described the California doctrine of concurrent jurisdiction as it relates to public trust-related claims such as Section 5937 of the Fish and Game Code. [The California Supreme Court has] held that the doctrine of concurrent jurisdiction applies to public trust-related claim, such as the plaintiffs' claim under Section 5937.").  This court independently concludes that the Board's position is consistent with this court's prior orders and with California case law. As the California Supreme Court explained in <u>National Audobon Society, et al. v. Superior Court</u>, 33 Cal.3d 419, 449 (Cal. 1983), "[a] long line of decisions indicates that remedies before the Water Board are not exclusive, but that the courts have concurrent original jurisdiction." Pursuant to their concurrent jurisdiction, the courts may employ the Water Board as a master.  <u>Id.</u> at 451. For these reasons, the courts retain jurisdiction to fashion a judicial remedy for enforcement of the statutory mandate appropriate to the circumstances. <u>Cal Trout v. Superior Court</u>, 218 Cal.App.3d 187 (Cal. Ct. App. 1990).  Accordingly, the Water Resources Control Board does not possess exclusive jurisdiction

1  over plaintiffs' § 8/§ 5937 claim.

2        **4.    D-935 Is Not Entitled to Preclusive Effect**

3        Third, even if D-935 did address the merits of plaintiffs'
4  claim, it would be not be entitled to preclusive effect under the
5  doctrine of claim preclusion.

6        The doctrine of claim preclusion "treats a judgment, once
7  rendered, as the full measure of relief to be accorded between the
8  same parties on the same 'claim' or 'cause of action.' . . . [T]he
9  effect of a judgment extends to the litigation of all issues
10 relevant to the same claim between the same parties whether or not
11 raised at trial."  Haphey v. Linn County, 924 F.2d 1512, 1515 (9th
12 Cir. 1991).  Under 28 U.S.C. § 1738, federal courts are required
13 to give preclusive effect to state court reviewed administrative
14 determinations.  In Miller v. County of Santa Cruz, 39 F.3d 1030,
15 1032-33 (9th Cir. 1994), the Ninth Circuit held that, as a matter
16 of federal common law, preclusive effect must also be given to
17 "state administrative adjudications of legal as well as factual
18 issues, *even if unreviewed*, so long as the state proceeding
19 satisfies the requirements of fairness outlined in United States
20 v. Utah Construction & Mining Co., 384 U.S. 394, 422 (1966)."
21 (emphasis added) (parallel citations and internal quotations
22 omitted).  Defendants argue that the Board's unreviewed decision
23 in D-935 should be accorded preclusive effect.  Again, the Board
24 itself takes the opposite position from defendants.  See *Amicus*
25 *Curiae* State Water Resource Control Board's Mem. in Oppo. to Def's
26 Mot. and in Supp. of Pl's Mot. (filed January 22, 2004), at 3 ("The

1  doctrines of res judicata or collateral estoppel do not bar the

2  plaintiffs from raising their Fish and Game Code section 5937

3  claim .").

4      It is hardly clear from the record that the process before the

5  State Water Resources Control Board was sufficiently similar to a

6  judicial process to make claim preclusion appropriate.  Miller

7  makes clear that an administrative ruling is *only* entitled to

8  preclusive effect when that proceeding "was conducted with

9  sufficient safeguards to be equated with a state court judgment."

10  39 F.3d at 1032; see Misischia v. Pirie, 60 F.3d 626, 629 (9th Cir.

11  1995) (holding that findings of administrative agencies must

12  satisfy both requirements for preclusion and procedural fairness

13  to have preclusive effect in federal court); Embury v. King, 191

14  F.Supp.2d 1071, 1082 (N.D. Cal. 2001) (declining to give preclusive

15  effect to unreviewed administrative decision where procedural

16  safeguards were lacking).

17      The Miller court held that three threshold requirements, known

18  as the Utah Construction factors, must be met: (1) that the

19  administrative agency act in a judicial capacity, (2) that the

20  agency resolve disputed issues of fact properly before it, and (3)

21  that the parties have an adequate opportunity to litigate."  39

22  F.3d at 1033 (citing Utah Construction, 384 U.S. at 422). [11] As the

23

24      [11] In Miller, these factors were satisfied; the county
    commission had rendered its decision only after "a public
25  evidentiary hearing at which Miller was represented by counsel and
    was permitted to present oral and documentary evidence and to call
26  witnesses."  39 F.3d at 1032.

1   Board's brief argues, "[b]ecause the State Board's predecessor made
2   no final determination of the applicability of Fish and Game Code
3   Section 5937 to Friant Dam in Decision 935, there can be no
4   identity of issues, no final judgment on the merits of this issue,
5   and consequently, no preclusive effect." SWRCB Amicus Br. at 15.

6       More fundamentally, there can be no claim preclusion here
7   because the parties have not, under Miller, had "an adequate
8   opportunity to litigate." 39 F.3d at 1033.  This is so because of
9   the simple fact that there is no privity between the present
10  plaintiffs and any of the parties in D-935.

11      For the foregoing reasons, the court cannot conclude that the
12  State Board's past decision forecloses plaintiffs' present claim.

13  **G.    WHETHER THE BUREAU HAS VIOLATED § 5937**

14      Finally, with the defendants' various contentions having been
15  dispensed with, it is possible to arrive at the question of
16  liability under § 5937.  As it happens, the issue as to the actual
17  merits of plaintiffs' first claim is among the least difficult of
18  the issues presented.

19      In CalTrout, Justice Blease addressed how much water must be
20  released into a dry river to comply fully with § 5937.  "The
21  answer," he said, "is enough to restore the historic fishery." 218
22  Cal.App.3d at 210.  To implement this mandate, the court directed
23  the City of Los Angeles to "release sufficient water into the
24  streams from its dams to reestablish and maintain the fisheries
25  which existed in them prior to [the City's] diversion of water."
26  Id. at 213.

1    In opposing plaintiffs' motion, the defendants have focused
2  their energies on various reasons why their claims should be
3  barred.  There is no genuine dispute, however, as to whether the
4  Bureau has released sufficient water to maintain historic
5  fisheries, and the record, in any event, is clear that the
6  Bureau has not.  The administrative record, which defendants
7  strenuously insisted must be produced before the court could
8  rule on the instant motions, merely confirms this fact.  Indeed,
9  plaintiffs' supplemental briefing contains ample evidence
10 derived from the record that establishes in great detail the
11 impact of the Friant Dam's operations on the native fish
12 populations.  <u>See</u> Pl's Corrected Supp. Br. in Supp. of Mot. For
13 Summ. Adj. (filed July 13, 2004), at 6-17.

14    The Bureau, by its own admission, releases no water for
15 this purpose and long stretches of the River downstream are dry
16 most of the time.  <u>See</u> Fed'l Defs.' Resp. to Plfs.' "Sep.
17 Statement of Undisputed Facts in Support of Plfs.' Mot. for
18 Summ. J.," ¶ 8, at 3 (filed July 2, 1992).[12]  Ten years ago, the
19 Bureau commissioned the Department of the Interior's Fish and
20 Wildlife Service to investigate and report on Chinook salmon in
21 the upper San Joaquin River.  The opening page of the report
22 states:

23 _____

24    [12]  At oral argument, the non-federal defendants asked, in
   effect, how far below the dam was "below the dam" for § 5937
25 purposes.  It appears to the court that the inquiry begs the
   question.  If the dam's operation interferes with the well being
   of the historic fisheries in the river, under <u>Cal Trout</u>, the dam
26 must be operated to obviate that result.

1    Historically, the upper San Joaquin River supported a
     large spring-run of chinook salmon.  The annual
2    spawning run of these fish numbered in the tens of
     thousands as late as the mid-1940s.  Although only
3    sparse or incomplete records are available, there
     probably was a fall-run of chinook salmon as well.
4    Counts made at the Dos Palos USGS gaging station
     indicate that fall-run escapement averaged about 1,000
5    spawners in the 1940s.  Both of these salmon stocks
     were extirpated when Friant Dam became fully
6    operational.

7    The extinction of these San Joaquin stocks can be
     directly attributed to inadequate instream flows,
8    specifically, those which enable adult salmon to
     migrate upstream. . . .  The project diverted nearly
9    the entire river and a long reach of the waterway had
     been dried up.

10

11   U.S. Dep't of the Interior, Fish & Wildlife Service, The

12   Relationship Between Instream Flow, Adult Immigration, and

13   Spawning Habitat Availability for Fall-Run Chinook Salmon in the

14   Upper San Joaquin River, California at 6 (Sept. 1994) (citations

15   omitted) (Macaux Decl., Ex. J).   There can be no genuine

16   dispute that many miles of the San Joaquin River are now

17   entirely dry, except during extremely wet periods, and that the

18   historic fish populations have been destroyed.

19       Accordingly, the court concludes that the Bureau of

20   Reclamation has violated § 5937 of the California Fish and Game

21   Code as applied to it by virtue of § 8 of the Reclamation Act of

22   1902.[13]

23   ─────────────

24       [13]  That this court has reached the conclusion that the Bureau
     has violated its duty hardly begins to address the problem of
     remedies.  In this regard, the court notes not only the issue of
25   whether the reasonableness component of the CVPIA constitutes an
     overlay on the Bureau's duties, but as the non-federal defendants
26   noted in oral argument, farmers throughout the valley have

40

1                      **IV.**

2                  **CONCLUSION**

3      For the foregoing reasons, plaintiffs' motion for summary

4 adjudication as to liability alone on their first claim is

5 hereby GRANTED and the Friant Defendants' and Chowchilla Water

6 District's motions for summary adjudication are hereby DENIED.

7      IT IS SO ORDERED.

8      DATED:  August 26, 2004.

9

10                 LAWRENCE K. KARLTON
                 SENIOR JUDGE

11                  UNITED STATES DISTRICT COURT

12

13

14

15

16

17

18

19

20

21

22

23 _____

24 dedicated their lives and fortunes to making the desert bloom.
They did so in reliance on the availability of CVP water.  That

25 reality most likely should be taken into account when the court
comes to address a remedy.  <u>See</u> <u>Amoco Production Co. v. Village of</u>

26 <u>Gambell</u>, 480 U.S. 531, 553-54 (1987); <u>Save the Yaak Committee v.</u>
<u>Block</u>, 840 F.2d 714, 722 (9th Cir. 1988).

United States District Court
for the
Eastern District of California
August 27, 2004


* * CERTIFICATE OF SERVICE * *


2:88-cv-01658


Natural Resources De

    v.

Houston

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  August 27, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

        Philip F Atkins-Patterson        AR/LKK
        Sheppard Mullin Richter and Hampton
        Four Embarcadero Center
        Suite 1700
        San Francisco, CA  94111

        Hamilton Candee
        Natural Resources Defense Council
        111 Sutter Street
        20th Floor
        San Francisco, CA  94104

        Fred H Altshuler
        Altshuler Berzon Nussbaum Rubin and Demain
        177 Post Street
        Suite 300
        San Francisco, CA  94108

        U S Attorney
        United States Attorney
        501 I Street
        Suite 10-100
        Sacramento, CA  95814

```
K Jack Haugrud
United States Department of Justice
Environment and Natural Resources
PO Box 663
Washington, DC  20044-0663

Eileen Sobeck
United States Department of Justice
Environment and Natural Resources Divisi
601 Pennsylvania Avenue NW
Suite 5000
Washington, DC  20530

Maria A Iizuka
United States Department of Justice
Environment and Natural Resources Div
501 I St
Ste 9-700
Sacramento, CA  95814-2322

Gregory K Wilkinson
Best Best and Krieger
PO Box 1028
3750 University Avenue
Suite 400
Riverside, CA  92502-1028

Denslow B Green
Green Green and Rigby
P O Box 1019
219 South D Street
Madera, CA  93638

Ernest Albert Conant
Law Offices of Young Wooldridge
The Unocal Plaza
1800 30th Street
Fourth Floor
Bakersfield, CA  93301-5298

Jan L Kahn
Kahn Soares and Conway
219 North Douty Street
Hanford, CA  93230

Kenneth A Kuney
Dooley and Herr LLP
100 Willow Plaza
Suite 300
Visalia, CA  93291-1351

Daniel M Dooley
Dooley and Herr LLP
100 Willow Plaza
Suite 300
Visalia, CA  93291-1351
```

```
Gary W Sawyers
Law Offices of Gary W Sawyers
6715 N Palm Avenue
Suite 116
Fresno, CA  93704

Jeffrey A Meith
Minasian Spruance Meith Soares and Sexton
PO Box 1679
1681 Bird Street
Oroville, CA  95965-1679

Michael Victor Sexton
Minasian Spruance Meith Soares and Sexton
PO Box 1679
1681 Bird Street
Oroville, CA  95965-1679

Mark William Poole
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA  94102-7004

Clifford T Lee
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA  94102-7004

John L Marshall
United States Department of Justice
Environment & Natural Resources Division
PO Box 7369
Ben Franklin Station
Washington, DC  20044-7369

Jason Cohen
United States Department of Justice
Environment and Natural Resources
601 D St NW
Room 3033
Washington, DC  20004

Lee N Smith
Stoel Rives LLP
770 L Street
Suite 990
Sacramento, CA  95814

Jon-David Rubin
Kronick Moskovitz Tiedemann and Girard
400 Capitol Mall
27th Floor
Sacramento, CA  95814-4417

James Mark Atlas
Frost Krup and Atlas
134 West Sycamore Street
Willows, CA  95988
```

Dante John Nomellini Jr
Nomellini Grilli and McDaniel
P O Box 1461
Stockton, CA  95201-1461

Leo Patrick O'Brien
Waterkeepers Northern California
55 Hawthorne Street
San Francisco, CA  94105-3924

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk