1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9

10 NATURAL RESOURCES DEFENSE
   COUNCIL, et al.,
11                                        NO. CIV. S-88-1658 LKK
            Plaintiffs,
12                                        ORDER ON MOTION FOR
                                          SUMMARY JUDGMENT RELATING
13    v.                                  TO THE ENDANGERED SPECIES
                                          ACT
14
   KIRK C. RODGERS, etc., et al.,
15
            Defendants.
16 _____/

17      Pending before the court is plaintiffs' motion for summary

18 adjudication as to liability on their claims relating to the

19 Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq.[1]

20 ////

21 _____

22      [1] During the January 20, 2005 Status Conference, the parties
   represented to the court that it was in the interest of the parties
23 to first resolve all the liability issues before turning to
   remedies.  The parties also stated their preference that the court
24 first resolve causes of action relating to liability under the
   Endangered Species Act before turning to the remaining causes of
25 action.  Consequently, this order covers only the plaintiffs' ESA
   claims, or causes of action four through six of the seventh amended
26 complaint.

                                  1

1  Plaintiffs allege that the United States Bureau of Reclamation

2  ("Bureau" or "BOR"), the National Marine Fisheries Service

3  ("NMFS"), and the Fish and Wildlife Service ("FWS") failed to

4  examine critical issues in their biological opinions before

5  executing twenty-five year water contracts in late 2000 for the

6  delivery of California Water Project water to over two dozen

7  irrigation and water districts in the Friant, Hidden, and

8  Buchanan units.

9       The Friant defendants bring a cross-motion for summary

10 adjudication and the federal defendants have filed an opposition

11 to the plaintiffs' motion.[2]

12 ////

13 ////

14 ////

15 ////

16 ////

17 

18      [2]  Defendant-Intervenors (San Luis & Delta-Mendota Water
   Authority and Tehama-Colusa Canal Authority)("intervenors") have
   also filed a "motion for summary judgment."  Plaintiffs' objection
19 to intervenors' statement of undisputed facts ("SUF") is sustained.
   Intervenors have filed two statements of undisputed facts, one
20 submitted on October 7 with their motion for summary judgment, and
   one on November 19, 2004, with their opposition.  Intervenor's
21 first appropriately filed SUF and corresponding motion for summary
   judgment addressed plaintiffs' third, seventh, and eight causes of
22 action, which were dismissed in the court's January 25, 2005 order.
   Intervenors' motion for summary judgment filed during this round
23 of briefing relies on the second filed SUF on November 19, 2004,
   a submission which violates Local Rule 56-260.  Consequently, the
24 court will not entertain intervenor's arguments in this round of
   briefing.  The court has examined the intervenors' "motion for
25 summary judgment" and determines they will not be prejudiced by
   this order as their arguments are adequately represented by the
26 Federal and Friant defendants.

1
## I.

2
### UNDISPUTED FACTS[3]

3
**A.    BACKGROUND**

4    The Bureau's operation of Friant Dam dried up many miles of

5  the San Joaquin River, destroying the historic fish populations.

6  Pls.' SUF 1, citing NRDC v. Patterson, 333 F.Supp.2d 906, 924

7  (E.D. Cal. August 27, 2004).  The Bureau's operation of Friant

8  Dam also extirpated numerous species of native fish from the

9  upper San Joaquin River, including spring- and fall-run Chinook

10  salmon.

11    The operation of the Dam has supported irrigated

12  agriculture through a large swath of the San Joaquin Valley.

13  Pls.' SUF 2, 3, citing NRDC v. Patterson, id.  The Bureau

14  delivers the diverted waters of the San Joaquin to more than two

15  dozen irrigation and water agencies that are represented in this

16  litigation by the Friant defendants.  It presently makes these

17  deliveries under long-term water supply contracts that provide

18  for the Bureau annually to divert, impound, and deliver up to

19  2.14 million acre-feet to the contractors per year.  Pls.' SUF

20  4.

21    After a number of renewed contracts were rescinded as a

22  result of this court's order in 1997 (affirmed by the Ninth

23  Circuit in 1998), the Bureau delivered water to the Friant

24  contractors pursuant to short term, or "interim" contracts,

25

26    [3]  All facts are undisputed unless otherwise noted.

1  which plaintiffs did not challenge.  Pls.' SUF 5.

2  **B.  RENEWAL OF CONTRACTS IN 2001 & AGENCY CONSULTATION UNDER ESA**

3

4      **1.  ESA Consultation on the Friant District Contracts**

5      In late 2000, the Bureau determined to execute a new round

6  of water contracts.[4]  Pls.' SUF 6, citing FWS AR 06017924.

7      In a July 2000 electronic-mail ("e-mail") message from

8  Frank Michny, an employee of the Bureau, to Cay Goude, a FWS

9  employee, explained that "everyone in the dept up to/including

10  Leshy want [sic] the contract renewals this year."  Pls.' SUF 6,

11  ////

12  _____

13      [4]  The "Friant contracts" that plaintiffs seek to invalidate
in this litigation are:  Arvin-Edison Water Storage District
(14-06-200-229A-LTR1); Chowchilla Water District - Friant Division
14  (I75r-2358-LTR1); Delano-Earlimart Irrigation District
(I75r-3327-LTR1); Exeter Irrigation District (I75r-2508-LTR1);
15  Fresno County Waterworks District No. 18 (14-06-200-5904-LTR1);
Fresno Irrigation District (14-06-200-1122A-LTR1); Garfield Water
16  District (14-06-200-9421-LTR1); Gravelly Ford Water District
(1-07-20-W0242-LTR1); International Water District
17  (14-06-200-585A-LTR1); Ivanhoe Irrigation District
(I75r-1809-LTR1); Lindmore Irrigation District (I75r-1635-LTR1);
18  Lindsay-Strathmore Irrigation District (I75r-1514-LTR1); Lower Tule
River Irrigation District (I75r-2771-LTR1); Madera, County of
19  (14-06-200-2406A-LTR1); Madera Irrigation District - Friant
Division (I75r-2891-LTR1); Orange Cove, City of
20  (14-06-200-5230-LTR1); Orange Cove Irrigation District
(I75r-1672-LTR1); Porterville Irrigation District (I75r-4309-LTR1);
21  Saucelito Irrigation District (I75r-2604-LTR1); Shafter-Wasco
Irrigation District (14-06-200-4032-LTR1); Southern San Joaquin
22  Municipal Utility District (I1r-1460-LTR1); Stone Corral Irrigation
District (I75r-2555-LTR1); Tea Pot Dome Water District
23  (14-06-200-7430-LTR1); Terra Bella Irrigation District
(I75r-2446-LTR1); and Tulare Irrigation District ( I75r-2485-LTR1).
24  These contracts can be found in the Bureau's Water Contracts
administrative record.  See USBR WC AR: 000773, 000172, 025149,
25  019329, 002192, 025212, 025279, 025341, 002672, 002841, 002974,
003156, 025466, 025587, 004084, 025850, 025913, 025977, 026041,
26  026106, 026167, 026231, 026297, 026357.  Pls.' Brief at 7.

4

1  citing FWS AR 0617394.[5]  FWS issued its biological opinion

2  ("BiOp") on these contracts on January 19, 2001 and NMFS issued

3  its biological opinion on the following morning, January 20,

4  2001.  In a letter dated October 30, 2000, the Bureau requested

5  that NMFS concur in a Section 7 determination that the Friant

6  contracts were not likely to adversely affect listed species.

7  NMFS refused to do so, forcing the Bureau to request formal

8  consultation for the long-term renewal of the Central Valley

9  Project water service contracts on January 5, 2001.  Pls.' SUF

10  7, citing NMFS AR 000526.  As of January 5, 2001, the Bureau had

11  not provided a final biological assessment on the Friant

12  contracts.  The Bureau provided the biological assessment on

13  January 17, 2001.  Pls.' SUF 9, citing FWS AR 0823519.

14      On January 19, 2001, the same day that the FWS BiOp was

15  issued, FWS senior biologist Dr. David Wright e-mailed Michael

16  Fris, another employee at FWS, discussing "possible holes and

17  weaknesses in our crash BO,"  Pls.' SUF at 11, citing FWS AR

18  01802983, 018023984, including inadequate time to do a

19  consultation, inadequate biological assessments, a track record

20  of lack of compliance by the Bureau of Reclamation, concern that

21  the contracts are inconsistent with CVPIA, and lack of

22  _____

23      [5]  The adjudication of this matter has been made substantially
    more difficult by the parties' failure to use the same Bates
    numbers system in their statements of undisputed facts.  Plaintiffs
24  and Federal Defendants use the numbers assigned to the documents
    by FWS and/or NMFS, while the Friant defendants use the numbers
25  assigned by the Bureau.  Thus, it is possible that the same
    documents will be cited differently, depending on how the parties
26  have cited the document in their SUFs.

1   coordination with NMFS.  Id.  Dr. Wright's supervisor, Michael

2   Thabault, forwarded Dr. Wright's memorandum up the chain of

3   command to Wayne White "in the interest of the deliberative

4   process," and so that he could "be aware of the vulnerabilities

5   before signing" [the biological opinion].  Pls.' SUF 11, citing

6   FWS AR 0823985.  That same day, on January 19, 2001, Dr. Wright

7   again wrote his colleague, Michael Fris, and asked him to "slam

8   out the Conclusion section" while he was "polishing Effects."

9   Pls.' SUF 12, citing FWS AR 0823988.

10       **2.  ESA Consultation on the Hidden and Buchanan Districts**

11       Two of the Friant districts have additional contracts with

12   the Bureau for delivery of water from CVP units.  Pls.' SUF 13.

13   The contracts are referred to as Chowchilla Water District,

14   Buchanan Unit (Contract # 14-06-200-3844A-LTR1) and the Madera

15   Irrigation District, Hidden Unit (Contract # 14-06-200-4020A-

16   LTR1).  Id.  The Hidden Unit contract provides for delivery of

17   24,000 acre-feet of water annually from Hensley Lake to Madera

18   Irrigation District, and the Buchanan Unit contract provides for

19   delivery of 24,000 acre-feet annually from Eastman Lake to

20   Chowchilla Water District.  Friant Defs.' SUF 49, citing BORESA

21   041538.  The renewal contracts concerning Hidden and Buchanan

22   reservoirs were executed on February 14 and 15, 2001.

23       **a.  NMFS's Consultation**

24       The January 5, 2001 formal consultation request to NMFS on

25   the Friant contracts had not encompassed the Hidden and Buchanan

26   contracts.  Pls.' SUF 22, citing NMFS AR 000526.  Nevertheless,

1   on February 12, 2001, NMFS issued a letter in response to the

2   Bureau's request, that NMFS did, in fact, "consider the effects

3   of the Hidden and Buchanan contracts in the Biological Opinion

4   issued to the Bureau on January 20, 2001."  Pls.' SUF 19, citing

5   NMS AR 0008881, et seq., NMFS AR 000915, Pls.' SUF 50, NMFS AR

6   000884, 000885, 000913, 000915.  The Bureau did not request

7   formal Section 7 consultation from NMFS on the Hidden and

8   Buchanan contracts.  Pls.' SUF 52, citing NMFS AR 000526-27,

9   000885, 000881.  No biological opinion was ever issued by NMFS

10  on the Buchanan and Hidden units.  Id.

11       **b. <u>FWS's Consultation</u>**

12       An internal FWS memorandum noted that a FWS biologist

13  "decided on 1-19-01 to not include Hidden and Buchanan Unit

14  Contracts in the Friant-Cross Valley Opinion due to insufficient

15  time to make the necessary changes in the project description

16  and effects."  Pls.' SUF 14, citing FWS AR 09024885-86.  After

17  issuance of the FWS 2001 BiOp and NMFS 2001 BiOp, the Bureau

18  notified FWS and NMFS that it had discovered an "administrative

19  oversight" in which the tables provided to the Services as part

20  of the project description for the consultation did not include

21  the Hidden and Buchanan contracts.  BORESA 045889, 041752.

22       On February 1, 2001, the Bureau formally requested

23  consultation with FWS on the Hidden and Buchanan contracts.

24  Pls.' SUF 19, citing FWS AR 09024891.  On February 14, 2001, FWS

25  issued a new biological opinion for the Hidden and Buchanan

26  contracts.  Pls.' SUF 16.  In an e-mail dated February 2, 2001

7

1  FWS employee, Michael Fris, wrote that "I don't think this is a

2  big deal, because I think this opinion is pretty much written up

3  thanks to the Friant opinion."  Pls.' SUF 17, citing FWS AR

4  09025034.

5      **3.  FWS's and NMFS's 2001 Biological Opinions**

6          **a.  The Services' "Adverse Modification" Analysis**

7              **i.  NMFS**

8      The entire discussion of the effects and cumulative effects

9  of the long-term Friant contracts in NMFS' January 20, 2001

10 biological opinion spans three pages.  In these pages, NMFS

11 acknowledged the potential impact of Friant diversions on

12 downstream fish, including the endangered Sacramento River

13 winter-run Chinook salmon.

14     The parties dispute whether NMFS' 2001 biological opinion

15 on the Friant contracts adequately addressed the recovery of

16 winter-run Chinook salmon.  Pls.' SUF 21, citing NMFS AR 900-02,

17 Fed. Defs.' Response SUF 25, citing BORESA 041554-55, 029201-03.

18 When the Bureau first attempted to renew the Friant contracts in

19 1991, it asked NMFS to concur that the contracts were not likely

20 to adversely affect winter-run Chinook salmon.  Pls.' SUF 27,

21 citing NRDC v. Houston, 146 F.3d 1118, 1123-4, 1126 (9th Cir.

22 1998).  By the time the Bureau initiated consultation on the

23 present Friant contracts, NMFS had listed two new threatened

24 species that inhabit the Delta, Central Valley Steelhead and

25 Central Valley spring-run Chinook salmon.  Pls.' SUF 30, citing

26 NMFS AR 000892.  Although NMFS had begun consultations with the

1  Bureau on CVP's effects on spring-run Chinook salmon and

2  steelhead, those consultations had not been completed as of

3  January 20, 2001.  Pl.'s SUF 31, citing NMFS AR 00084.[6]

4              ii. **FWS**

5      At the time FWS issued its January 19, 2001 biological

6  opinion, FWS had designated critical habitat for at least seven

7  species considered in the 2001 consultation, the California

8  condor, Delta smelt, Fresno kangaroo rat, least Bell's vireo,

9  Little Kern golden trout, Southwestern willow flycatcher, and

10  the Valley elderberry longhorn beetle.  Pls.' SUF 24, citing FWS

11  BiOp at 1-8 to -7, 3-23; BORESA 039978-80.  FWS's January 19,

12  2001 biological opinion mentioned "recovery" in connection with

13  its effects analysis for the Delta Smelt, least Bell's vireo,

14  and the Southwestern willow fig catcher.  Pls.' SUF 25.  The

15  parties dispute whether the FWS's 2001 BiOp drew a conclusion as

16  to whether the Friant contracts, taken together with cumulative

17  effects, would result in adverse modification of the critical

18  habitat of the least Bell's vireo.  Pls.' SUF 26, citing FWS

19  BiOp at 3-23 to -24, FWS BiOp at 1-7, 5-7; BORESA 040068-69;

20  BORESA AR 039980, 040128.

21  ////

22  ////

23  ////

24  _____

25      [6]  NMFS's 2001 BiOp explains that there is an ongoing
   consultation to update the NMFS 1993 opinion on the CVP/State Water
   Project, which is anticipated to be completed prior to March 1,
26  2001.  NMFS AR 00084.

1  **B.   THE SERVICES' JEOPARDY ANALYSES**

2       **1.   <u>NMFS</u>**

3       NMFS's Biological Opinion concluded that "the renewal CVP

4  long-term water service and repayment contracts for the twenty-

5  eight Friant Division water contractors and the eight (8) Cross

6  Valley water contractors for a period of 25 years is not likely

7  to jeopardize the continued existence of winter-run Chinook

8  salmon, spring-run Chinook salmon, or Central Valley steelhead,

9  or result in the destruction or adverse modification of

10  designated critical habitat for these species."  Friant Defs.'

11  SUF 29, citing BORESA 041555.

12      **2. <u>FWS</u>**

13      On January 18, 2001, a meeting occurred between FWS

14  biologists and their field supervisor, Wayne White, among

15  others, where they discussed "status and some outstanding issues

16  relevant to the Friant/Cross Valley long-term contract

17  renewals."  Pls.' SUF 34, citing FWS AR 08023904.  Dr. David

18  Wright, the field supervisor of the Sacramento FWS office,

19  advised Mr. White, who was in charge of FWS' California and

20  Nevada offices, that this "long-term contract renewal . . .

21  would be a jeopardy on indirect effects."  Mr. White rejected

22  Dr. Wright's analysis, however, because consideration of such

23  effects "would be a hard sell outside California."  Another FWS

24  biologist, Joy Winckel, asked Mr. White whether they could even

25  consider jeopardy at all.  Mr. White stated that it was "too

26  late" to consider jeopardy.  The opinion had to be rushed out

1  the following day, Mr. White explained, to avoid the opinion

2  becoming even weaker under the incoming Bush administration."

3  Pls.' SUF 35, citing FWS AR 08023904.

4      In order "[t]o reach a no jeopardy conclusion," FWS's

5  January 19, 2001 BiOp on the Friant contracts excluded certain

6  actions which "will require separate determinations regarding

7  their potential effects on threatened and endangered species and

8  critical habitat pursuant to section 7 and/or section 10 of the

9  ESA."  Pls.' SUF 36, citing FWS 080240263.[7]  FWS had been

10 concerned with operations and maintenance activities associated

11 with contract deliveries.[8]  During the 1991 consultation on the

12 now invalidated Friant long-term renewal contracts, for example,

13 as well as during subsequent consultations on the interim

14 contracts adopted after NRDC v. Houston, FWS's biological

15 opinion required the Bureau to commit to preparing guidance on

16 how to conduct operations and maintenance activities so as to

17 minimize endangered species impacts.  The Bureau, however, was

18 "behind the date identified in the Interim opinion" in

19 implementing the operation and maintenance plan.  Upon

20 _____

21     [7]  FWS's BiOp explains that these related actions include but
   may not be limited to operations and maintenance activities, water
   transfers, assignments, and exchanges by Friant and Cross-Valley
22 contractors, including flood flows, and Warren Act contracts for
   conveyance of non-federal water using federal facilities.  FWS BiOp
23 41, FWS AR 08024103.

24     [8]  A January 2, 2001 internal FWS memorandum describes two
   unauthorized riverbed recontouring jobs by the Lower Tule River
25 Irrigation District, in 1999 and 2000, that destroyed at least
   several hundred elderberry bushes.  Pls.' SUF 37, citing FWS AR
26 08023055.

completion of consultation on the contracts at issue here, FWS again required the Bureau to commit to completing site-specific operations and management plans within one year of the January 19, 2001 biological opinion.  Pls.' SUF 37, citing FWS BiOp 2-38, BORESA 040026.

FWS's January 19, 2001 BiOp recognizes that operations and maintenance activities on Bureau facilities used to deliver Bureau water to the Friant contracts are related to the Friant contracts.  Operations and maintenance activities were identified as "requiring section 7 consultation separate from the present opinion."  FWS's opinion advised the Bureau to "consider whether it may have a duty to avoid irreversible or irretrievable commitments pending any biological opinion on that 'related action.'"  Pls.' SUF 39, citing FWS BiOp at 4-1, BORESA 040104.  The FWS biologists who conducted the Friant contract consultation understood that they were not analyzing indirect effects of the Friant contracts, from interrelated operations and maintenance activities.  Pls.' SUF 40, citing FWS AR 08023512.[9]

The Friant long-term contracts cumulatively authorized the Bureau to deliver more than 2.1 million acre-feet of water per year, for twenty-five years.  Pls.' SUF 41, citing FWS BiOp 2-3, ////

---

[9]  Plaintiffs cite an internal FWS memorandum where a FWS biologist expressed concern that addressing operations and maintenance in a separate opinion would limit BOR's ability to condition the contracts (e-mail from David Wright to Joy Winckel).

1  2-5 to-6 (Table 1.4), USBR ESA AR 039991, 039993-4.[10]

2  The parties dispute the exact amount of water that the BiOps on

3  the Friant contracts actually considered in the consultation.

4  FWS opined that "delivery of full contract quantities is

5  unrealistic and that deliveries will continue to be impacted by

6  existing climate, hydrology, actions and statutes including, but

7  not limited to existing biological opinions, existing

8  implementation of the CVPIA, and conformance and adherence to

9  additional existing State and Federal regulations and

10 guidelines; and socioeconomic factors."  Friant Defs.' SUF 13,

11 FWS January 19, 2001 BiOp, BORESA 040104-040105.  FWS conducted

12 its analysis under the expectation that water will be delivered

13 to CVP service contractors in quantities that approximate

14 historic deliveries (1988 through 1997) as given in Appendix D

15 of the November 21, 2000 programmatic long-term CVP contracts

16 consultation.  Id.

17      FWS understood when preparing its biological opinion that

18 its assumptions regarding water deliveries were "needed to . . .

19 enable use [sic] to get No Jeopardy."  Pls.' SUF 45, citing FWS

20 AR 08023997 (e-mail from Michael Hoover to David Wright).  In

21 reaching its "no jeopardy" and "no adverse modification"

22 conclusions, FWS relied on the Bureau's stated commitment, as

23 set forth in the project description of the FWS's biological

24 _____

25      [10]  "Full entitlements are 2,115,975 acre-feet for the Friant
   division and 128,300 acre-feet for the Cross Valley Division."
26 BORESA 039991, FWS BiOp 2-3.

1  opinion, to carry out an extensive, thirty-three page list of

2  measures that would mitigate the adverse direct and indirect

3  effects of the Friant contracts.  FWS "assumed" that the Bureau

4  would fully and timely carry out these mitigation measures, as a

5  predicate to FWS's "no jeopardy" finding.  Pls.' SUF 46, citing

6  FWS BiOp at 2-22 to 2-55, 4-1; BORESA 040010-040043, 040104.

7      While some progress was made by the Bureau on various

8  commitments to keeping mitigation promises, the Bureau was still

9  in the process of meeting its obligations.  Pls.' SUF 48,

10 citing, e.g., BORESA 040017.

11 **D.  OTHER BIOLOGICAL OPINIONS**

12      **1.  November 2000 NMFS and FWS Biological Opinions**

13          **a.  NMFS**

14      In November 2000, NMFS prepared a document relating to both

15 the CVPIA (Central Valley Project Improvement Act) and the CVP

16 (Central Valley Project), entitled "Programmatic Biological

17 Opinion for the Improvement Act Preferred Alternative and

18 Proposed Record of Decision" ("NMFS Programmatic BO").  The NMFS

19 CVPIA BiOp declared that the CVPIA FPEIS is "a tiered National

20 Environmental Policy Act document that allows for future site-

21 specific NEPA analysis on CVPIA actions," and that "[t]his

22 biological opinion is similarly tiered."[11]  Friant Defs.' SUF 7,

23 _____

24      [11]  The FWS Opinion states:

25      This consultation is intended to address, in a
        comprehensive manner, the numerous and widely varied
        actions related to implementation of the CVPIA and the
26      continued operation and maintenance of the CVP that may

  
1 citing BORESA 29833.  The parties dispute whether the FWS and
2 NMFS 2001 BiOps on the Friant Long-Term Contracts were preceded
3 by and "tiered" from eight previous biological opinions.  NMFS's
4 programmatic BiOp evaluated the Delta Division operations of the
5 CVP, discussing the Tracey Pumping plant.

6       **b.  <u>FWS</u>**

7       In November 2000, FWS prepared a "Biological Opinion" on
8 the Implementation of the CVPIA and Continued Operation of the
9 Maintenance of the CVP.   This opinion is colloquially known as
10 the "Mother Opinion."  Friant Defs.' SUF 1, citing BORESA
11 052972-052977.  The FWS Mother Opinion explains that "Site
12 specific or tiered consultations following this programmatic
13 consultation will rely on programmatic assumptions made during
14 this consultation process while development and implementation
15 of site specific actions will rely on the direction provided by
16 both consultation processes."  Friant Defs.' SUF 4, citing
17 BORESA 052934-052935.  Included among the proposed actions upon
18 which the consultation occurred was the "Long-Term Renewal of
19 ////

20 ─────────────────

21          be undertaken by the service and/or Reclamation.  While
         a number of the actions are clearly interrelated and
22       interdependent, others are not and could be considered
         as stand alone actions . . . the Service and Reclamation
23       have agreed that activities listed in the Project
         Description would be evaluated as a suite of actions all
24       related in one form or another to the CVP and/or CVPIA.
         Therefore, this biological opinion addresses the effects
25       upon listed species resulting from implementation of
         this suite of actions as a whole.

26 Friant Defs.' SUF 3.

1  CVP Water Service Contracts."[12]   Identified among contracts to be

2  renewed were the Friant Division contracts.   Friant Defs.' SUF

3  5, citing BORESA 052972-052976.

4       The FWS Mother Opinion includes discussion of operations

5  and maintenance activities, commitments made by the Bureau

6  regarding operations and maintenance planning, and the direct

7  and indirect effects of operations and maintenance activities of

8  the CVP.   Friant Defs.' SUF 32, citing BORESA 052989-052992,

9  053002-053003, 053053.[13]   The Mother Opinion asserts that it

10 considered the "direct and indirect effects of agricultural

11 conversions and related operations" and the "direct and indirect

12 effects of municipal and industrial conversions" facilitated by

13 the CVP.   Friant Defs.' SUF 19, citing BORESA 053048-053051.

14 FWS rendered non-jeopardy opinions regarding continued CVP

15 operations, but specifically stated that those opinions were

16 based upon "implementation of and compliance with all of the

17 conservation measures and commitments," and "commitments to

18 uphold ESA by both agencies, combined with implementation . . .

19 of programs . . . ."   Friant Defs.' SUF 20, citing BORESA

20 053068, 039988.

21 ─────────────

22       [12]   The Mother Opinion, however, explained that after the
   negotiations on the renewal were completed, "the renewals will be
   subject to a separate, tiered analysis that is consistent the NEPA
23 tiering in the PEIS . . . .   The site specific, tiered analysis
   will address direct and indirect effects of contract renewal."
24 BORESA 052972.

25       [13]   Plaintiffs point out that Appendix K from the Mother
   Opinion defines activities that require further site-specific
26 consultation.   BORESA 053423-24.

1        **II.**

2        **ANALYSIS**[14]

3        Plaintiffs challenge various biological opinions issued by

4   the FWS and NMFS which preceded the renewal of long-term water

5   contracts in the Friant, Buchanan, and Hidden water units.[15]

6   They contend that Federal defendants failed to complete

7   environmental reviews as required by ESA and that the consulting

8   agencies issued biological opinions which fail to comply with

9   the law.[16]   I decide these motions based on the parties' papers,

10

11       [14]   The court has, in the course of this case, repeatedly
articulated the standards applicable to summary judgment and
nothing would be served by repeating them here.

12

13       [15]  Defendants specifically challenge the following biological
opinions issued by FWS and NMFS: (1) FWS's January 19, 2001

14   "Biological Opinion on U.S. Bureau of Reclamation Long Term
Contract Renewal of Friant Division and Cross Valley Unit Contracts

15   ("FWS 2001 BiOp")(BORESA 039974); (2) FWS's February 14, 2001
"Biological Opinion on U.S. of Reclamation Long Term Contract

16   Renewal of Buchanan and Hidden Units Contracts" ("FWS Hidden and
Buchanan BiOps")(BORESA 053428); (3) NMFS's January 20, 2001

17   "Biological Opinion on the Proposed Long-Term Renewal of Central
Valley Project Water Service Contracts for the Friant Division and

18   Cross Valley Canal Unit Contractors" ("NMFS 2001 BiOp")(BORESA
041534).

19       [16]  Plaintiffs previously challenged the renewal of long-term
water contracts before this court over one decade ago.  BOR first

20   executed long-term forty-year contracts with certain Friant water
districts in the middle of the last century.  By the late 1980s,

21   these contracts began to expire.  The Bureau then began to issue
long-term "renewal" contracts on terms largely unchanged from the

22   original contracts.  Plaintiffs alleged that the Bureau failed to
complete environmental reviews on these renewal contracts, and

23   filed suit in December 1988.  On May 31, 1995, this court ruled
that the renewed contracts were executed in violation of ESA.  See

24   May 31, 1995 Order at 29.  Eighteen months later, after extensive
briefing on the appropriate remedy for the ESA violations, this

25   court ordered those contracts rescinded.  See January 16, 1997
Order at 36.  The Friant defendants appealed those orders.  On June

26   24, 1998, the Ninth Circuit affirmed this court's finding that the

1  the administrative record lodged with this court, and after oral

2  argument.

3  **A.    STANDARD OF REVIEW**

4       This court is charged with reviewing agency actions under

5  the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A),

6  and must be satisfied that the decisions are not "arbitrary,

7  capricious, an abuse of discretion, or otherwise not in

8  accordance with law." <u>Nev. Land Action Ass'n v. United States</u>

9  <u>Forest Serv.</u>, 8 F.3d 713, 716 (9th Cir. 1993); 5 U.S.C. §

10 706(a)(2).  The court's review is "narrow" but "searching and

11 careful," <u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360, 378

12 (1971).  Review of the issues subject to the arbitrary and

13 capricious standard examine whether the agencies' decisions are

14 based on a consideration of the relevant factors and whether the

15 agencies articulated a rational connection between the facts

16 found and the decisions made.  <u>Id</u>. at 526.

17 **B.   LEGAL FRAMEWORK**

18      For any federal action that may affect a threatened or

19 endangered species or its habitat, the agency contemplating the

20 action, otherwise known as "the action agency " (here, the

21 Bureau of Reclamation), must consult with the appropriate

22 "consulting agency" (here, the FWS and NMFS), for the purpose of

23 ensuring that the federal action is not likely to: (1)

24 jeopardize "the continued existence of" an endangered or

25 —————————————————

26 Bureau had violated the ESA and upheld this court's rescission
   order.  <u>NRDC v. Houston</u>, 146 F.3d 1118, 1129 (9th Cir. 1998).

1  threatened species; and (2) that the federal action will not

2  result in the "destruction or adverse modification" of the

3  designated critical habitat of the listed species.  16 U.S.C.

4  § 1536(a)(2).[17]

5      Typically, the action agency makes a written request to the

6  consulting agency, 50 C.F.R. § 402.14(c), and after formal

7  consultation, the process concludes with the consulting agency

8  issuing a biological opinion.  The BiOp must address both the

9  jeopardy and critical habitat prongs of Section 7 by considering

10 the current status of the species, the environmental baseline,

11 the effects of the proposed action, and the cumulative effects

12 of the proposed action.  50 C.F.R. § 402.14(g)(2)-(3).  <u>See</u>

13 <u>generally</u> <u>Gifford Pinchot Task Force v. United States Fish &</u>

14 <u>Wildlife Serv.</u>, 378 F.3d 1059, 1063-65 (9th Cir. 2004).

15 Regardless of whether critical habitat is designated, an agency

16 must consult with the Secretary where an action will "jeopardize

17 the continued existence" of a species.  If critical habitat has

18 been designated, ESA imposes an additional consultation

19 requirement where an action will result in the "destruction or

20 adverse modification" of critical habitat.  16 U.S.C. § 1536(a).

21 If the BiOp concludes that the proposed action is likely to

22 jeopardize a protected species, the agency must modify its

23 proposal according to the service's suggestions or risk being

24 found in violation of the statute.  16 U.S.C. § 1536(b)(3)(a);

25 ─────────────

26     [17]  These consultations are often referred to as "Section 7
   consultations."

19

1   Tribal Village of Akutan v. Hodel, 869 F.2d 1185, 1193 (9th Cir.

2   1988).  Section 7(d) of ESA forbids the "irreversible or

3   irretrievable commitment of resources" during the consultation

4   process.

5        Plaintiffs challenge the three BiOps under both the

6   jeopardy and critical habitat prongs of Section 7.  Below, I

7   address the consulting agencies' analyses of the critical

8   habitat requirement on the Friant units, and then examine their

9   treatment of the jeopardy requirement.[18]  This order will then

10  address the agencies' consultation on the Buchanan and Hidden

11  water units.

12  **C.   THE SERVICES' "ADVERSE MODIFICATION OF CRITICAL HABITAT"**
        **ANALYSES**

13

14       An ESA biological opinion must determine whether the

15  federal action will result in the "destruction or adverse

16  modification" of the designated "critical habitat" of the listed

17  species.  16 U.S.C. § 1536(a)(2).  Plaintiffs argue that NMFS

18  and FWS failed to properly consider and analyze whether the

19  renewal of the contracts was likely to result in adverse

20  modification of critical habitat for the winter-run Chinook

21  salmon and for other listed species with critical habitat.

22  ////

23  _____

24       [18]   The court has examined the February 14, 2001 Hidden and
    Buchanan FWS biological opinion, and agrees with plaintiffs that
    they are "materially the same as the FWS' January 19, 2001"
25  biological opinion (on the Friant units), Pls.' Br. at 12.  See
    BORESA 053428, et seq.  Thus, the analysis of the January 19, 2001
26  BiOp also applies to the February 14, 2001 BiOp.

1  Before addressing that contention, I discuss a threshold issue,

2  the agencies' interpretation of "adverse modification" pursuant

3  to 50 C.F.R. § 402.02.

4      **1.    The Services' Definition of "Destruction or Adverse**
           **Modification" under 50 C.F.R. § 402.02 and Gifford**
5          **Pinchot**

6      It is undisputed that at the time FWS and NMFS issued their

7  biological opinions in 2001, they applied a definition of

8  "destruction or adverse modification" of critical habitat that

9  the Ninth Circuit has recently held to be invalid.[19]  Gifford

10  Pinchot Task Force v. United States Fish & Wildlife Serv., 378

11  F.3d 1059, 1069 (9th Cir. 2004).  The regulatory definition

12  "requires appreciable diminishment of the critical habitat

13  necessary for survival before the 'destruction or adverse

14  modification' standard could ever be met."  Id.  Put

15  differently, under the regulation "a proposed action 'adversely

16  modifies' critical habitat if, and only if, the value of

17  critical habitat for *survival* is appreciably diminished."  Id.

18  That understanding, the Circuit held, "reads the 'recovery' goal

19  out of the adverse modification inquiry" and "cannot be right"

20  because the Services would be "obligated to be indifferent to,

21  if not to ignore, the recovery goal of critical habitat."  Id.

22  _____

23      [19]   The Services' regulation defined "destruction or adverse
   modification" as "a direct or indirect alteration that appreciably
24  diminishes the value of critical habitat for both the survival and
   recovery of a listed species.  Such alterations include, but are
25  not limited to, alterations adversely modifying any of those
   physical or biological features that were the basis for determining
26  the habitat to be critical.  50 C.F.R. § 402.02.

1  at 1070 (citing <u>N.M. Cattle Growers Ass'n v. United States Fish</u>

2  <u>and Wildlife Serv.</u>, 248 F.3d 1277, 1289 & n.2 (10th Cir. 2001)

3  and <u>Sierra Club v. United States Fish and Wildlife Serv.</u>, 245

4  F.3d 434, 441-42 (5th Cir. 2001)).  Such a reading, the court

5  held, "contradicts Congress's express command" and constitutes

6  "a failure of the regulation to implement Congressional will."

7  <u>Id</u>. at 1069-70.[20]  In sum, the Circuit held that the Services

8  must consider both species' survival and recovery in considering

9  whether the proposed action adversely modifies critical habitat.

10 <u>Id</u>. at 1070.

11     The Circuit also explained that when analyzing the BiOps'

12 critical habitat analysis, courts "must presume, unless rebutted

13 by evidence in the record, that the [Services] followed [their]

14 definition of adverse modification and thereby ignored the

15 evaluation of whether adequate critical habitat would remain to

16 ensure species recovery."  <u>Id</u>. at 1070.  The Government could

17 also show "harmless error" by proving that, even if it ignored

18 recovery on the record by following its regulation, it did not

19 affect the result of the critical habitat analysis.[21]

20 _____

21     [20]  The Ninth Circuit elaborated that such a reading would
   allow the Services to authorize the "complete elimination of
22 critical habitat necessary only for recovery, and so long as the
   smaller amount of critical habitat necessary for survival is not
23 appreciably diminished, then "no destruction or adverse
   modification" has taken place.  978 F.3d at 1070.

24     [21]  Nonetheless, the Circuit concluded that such an argument
   is disfavored because the Services (and in this case, the court)
25 would be required to craft a hypothetical critical habitat analysis
   that takes into account species recovery in order to compare
26 process and outcome to the non-recovery analysis in the BiOps.  <u>Id</u>.

1    Plaintiffs assert that the Services' failed to consider

2  whether the contracts were likely to result in adverse effects

3  on critical habitat for winter-run Chinook, and other listed

4  species with designated critical habitat.  Defendants contend

5  that they did, in fact, consider both recovery and survival in

6  their biological opinions.  Under Gifford Pinchot, this court

7  must presume that the Services followed their now-invalid

8  regulation and examine whether defendants can bear the burden of

9  showing that the record rebuts such a presumption for each of

10  the listed species.  Put differently, but to the same effect,

11  the question is whether defendants can demonstrate that the

12  record supports a conclusion that NMFS analyzed species recovery

13  or conservation in the context of critical habitat and ignored

14  their own regulation.  Gifford Pinchot, 378 F.3d at 1075.

15  ////

16  ////

17  _____

18  at 1072, n. 8 (citing Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971)).  Thankfully, the court need not address this
19  issue because neither Federal nor Friant defendants have made such
    an argument.
20      In Gifford Pinchot, defendants argued that they implicitly
    considered recovery in their critical habitat analysis, thus
21  ignoring their own regulation.  Thus, as the Ninth Circuit
    explained, Federal defendants did not argue that they relied on the
22  regulation and that the reliance was harmless.  Instead, the
    agencies asserted a much more nuanced point, that consideration of
23  recovery was implicit in their critical habitat analysis, and that
    FWS met the ESA standards.  Based on their papers and oral
24  argument, it appears to the court that in the instant case Federal
    defendants assert a similar position, i.e., that they implicitly
25  considered recovery and survival in their biological opinions, and
    that however this court interprets the adverse modification
26  regulatory definition, the Services met the appropriate standard.

1          **2.  <u>Winter-run Chinook Salmon (Plaintiffs' Sixth Claim)</u>**

2          Friant defendants maintain that <u>Gifford Pinchot</u> does not

3   apply because NMFS has withdrawn its critical habitat

4   designation for winter-run Chinook and because the Friant

5   contracts do not adversely modify critical habitat of winter-run

6   Chinook.  The administrative record does not support the

7   argument.

8          NMFS first designated critical habitat for winter-run

9   Chinook in 1993, 58 Fed. Reg. 33212 (June 16, 1993), and that

10  designation remains valid.  As plaintiffs note, a BiOp issued by

11  NMFS on October 22, 2004 confirms that critical habitat was, and

12  remains, designated for winter-run Chinook salmon.  <u>See</u>, <u>e.g.</u>,

13  Request for Judicial Notice in Supp. of Opp. of Def.-Ints.

14  SLDMWA and Tehama-Colusa Canal Authority to Mot. by NRDC, et al.

15  for Summ. Adj. (Nov. 19, 2004), Ex. B at 48 (describing current

16  critical habitat designation for winter-run Chinook).[22]  Friant

17  defendants assert that NMFS vacated its designation by consent

18  decree, citing <u>Ass'n of California Water Agencies v. Evans</u>, 386

19  F.3d 879, 881 (9th Cir. 2004) and <u>Nat'l Ass'n of Home Builders</u>

20  <u>v. Evans</u>, 2002 WL 1205743 (D.D.C. 2002).  Both of these cases

21  challenged 65 Fed. Reg. 7764 (Feb. 16, 2000), which designated

22  critical habitat for nineteen listed populations of steelhead

23  ////

24

_____

25      [22]  NMFS's website also states that the critical habitat
    designated for winter-run chinook salmon remains valid.  <u>See</u>
26  http://www.swr.nmfs.noaa.gov (viewed on April 3, 2005).

1 trout and salmon, not including the winter-run Chinook.[23]

2      Alternatively, Friant defendants argue that the renewal of

3 the contracts has no effect on the critical habitat of the

4 winter-run Chinook.  They inappropriately extract one sentence

5 from the "effects" discussion in NMFS' 2001 BiOp which states

6 that "[s]ince winter-run chinook and spring-run chinook are not

7 present in the San Joaquin River system, they will not be

8 affected by these circumstances."  "[T]hese circumstances" refer

9 to the direct effects of Friant Dam's diversion on the winter-

10 run chinook.   BORESA 041554.  Friant defendants contend that

11 it is "speculation that [winter-run] chinook might return to the

12 upper San Joaquin River to spawn at some future date, so that

13 the continuation of present water diversions might 'adversely

14 affect' their potential future habitat."  Friant Def.'s Br. at

15 13, n. 7.  I cannot agree.

16      While it is true that NMFS' 2001 BiOp observes that winter-

17 run chinook salmon "no longer occur within the San Joaquin

18 Basin," the 2001 BiOp also states that "[v]iable populations of

19 these listed species currently spawn and rear in accessible

20 river reaches."  Further, "[d]esignated critical habitat" for

21 winter-run chinook includes "all river reaches and estuarine

22 ////

23 ////

24 _____

25    [23]   The nineteen salmon and steelhead species at issue
included the California Central Valley spring-run chinook and the
California coastal chinook, but did not include the winter-run
26 chinook.  See Fed. Reg. 7764.

25

1   areas of the Sacramento-San Joaquin Delta."[24]   BORESA 041550.

2   According to the 2001 BiOp, "[t]he essential elements of

3   designated critical habitat [for winter-run chinook] are the

4   water, substrate, and adjacent riparian areas."   Id.

5        Friant defendants' argument that the contracts do not

6   adversely modify the critical habitat of winter-run chinook must

7   be rejected because the Services are required to analyze

8   indirect effects caused or induced by the action that are

9   "reasonably certain to occur," in addition to the direct

10  effects.   50 C.F.R. § 402.02.   As plaintiffs note, NMFS

11  concluded that there would be "[p]otential indirect effects of

12  the proposed contract renewals" on the critical habitat of

13  winter-run chinook, including changes in surface water storage,

14  changes in stream flows in the lower San Joaquin River, and

15  changes in flows through the Delta and/or other CVP facilities."

16  Id.   NMFS explained that "[f]low changes within the Delta . . .

17  may also exacerbate the conditions that entrain [winter-run]

18  juveniles . . . into the southern Delta and the pumping plants

19  of the CVP and State Water Project."   Id.   Contrary to Friant

20  defendants' assertions, NMFS's analysis in the 2001 BiOp

21  concluded that winter-run chinook would be impacted through

22  ////

23  ////

24  ──────────────

25  [24]   Thus, NMFS's analysis directly contradicts' Friant
    defendants' assertion that "critical habitat for winter-run salmon
    was only designated on the Sacramento River."   Friant Defs.' Br.
26  at 16.

1 indirect effects of the proposed action.[25]  Federal defendants

2 were, as they recognize, Fed. Defs.' Br. at 12, required to

3 assess the impact of the contract renewal on habitat critical to

4 recovery of the winter-run chinook salmon.

5    Both Friant and Federal defendants assert that the agency

6 did, in fact, ignore the now-invalidated regulations and

7 adequately considered recovery of winter-run chinook salmon in

8 the context of their critical habitat.  Friant Defs.' Br. at 13-

9 14; Fed Defs.' Br. at 17-18.  I cannot agree.

10    Federal defendants assert that this court must consider

11 other documents besides the NMFS's 2001 BiOp because the BiOp

12 was "tiered off" these documents, "resulting in a thorough

13 biological review . . . ." Fed. Defs.' Br. at 6, 12.  Federal

14 defendants assert that NMFS considered long-term renewal of the

15 CVP water service contracts in its November 14, 2000

16 Programmatic BiOp,[26] and that this, along with the passages cited

17

18 [25]  This court has also previously recognized that indirect
effects, including "[t]he pumping and reverse flows associated with
[water exports of Delta water through the Delta-Mendota Canal], may
19 affect [winter-run] species outside the Friant service area." See
May 31, 1995 Order at 19.
20

21 [26]  In 1992, Congress enacted the Central Valley Project
Improvement Act ("the Act") as Title XXXIV of the Reclamation
Projects Authorization and Adjustment Act of 1992, Pub.L. No.
22 102-575, 106 Stat. 4600, 4706-31 (1992); the law took effect on
October 31 of the same year.  CVPIA seeks to achieve "a reasonable
23 balance among competing demands for use of Central Valley Project
water, including the requirements of fish and wildlife,
24 agricultural, municipal and industrial and power contractors."
Section 3402(f).  Section 3406(b)(2) of the CVPIA directs the
25 Secretary to dedicate and manage annually eight hundred thousand
acre-feet of Central Valley Project yield for the primary purpose
26 of implementing the fish, wildlife and habitat restoration purposes

1   from the 2001 BiOp show that federal defendants "properly took

2   recovery into account." Fed. Defs.' Br. at 14.

3       In Gifford Pinchot, the Ninth Circuit, for the first time,

4   approved of "tiering," or "programmatic environmental analysis

5   supplemented by later project-specific environmental analysis"

6   in the ESA context.  378 F.3d at 1067-68, citing Salmon River

7   Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir.

8   1994)(approving of tiering in the NEPA context). It held that

9   the defendants there could tier to the National Forest Plan

10  because it was a "unique land-management plan" that had already

11  been approved by this court" and that it was "hesitant to fault

12  the agency for relying on it in the context of this case." Id.

13  Arguably, the Ninth Circuit took the unusual step of approving

14  tiered ESA analysis in Gifford Pinchot because the Forest Plan

15  which served as the programmatic opinion was not ordinary, but a

16  particularly thorough and complex one which survived a legal

17  challenge.  Id. at 1067-68.  If so, the holding was a narrow

18  one, not applicable to all ESA cases.[27]  Because this court is

19

20  and measures authorized by this title; to assist the State of
    California in its efforts to protect the waters of the San
21  Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help
    meet such obligations as may be legally imposed upon the Central
22  Valley Project under State or Federal law following the date of
    enactment of this title, including but not limited to additional
23  obligations under the Federal Endangered Species Act.  Under the
    CVPIA, defendants were charged with issuing BiOps and EIS
24  statements which comply with ESA and NEPA.

25      [27]  This court is bound by the Ninth Circuit's holding, but
    must confess to reservations about extending  "tiered analysis" to
26  ESA.  Tiered consultation, while discussed in the implementing
    regulations of NEPA, is not described anywhere in ESA or its

28

1  uncertain about the scope of <u>Gifford Pinchot</u>, and discretion

2  being the better part of valor, the court will proceed to

3  consider whether tiering aids defendants in the matter at bar.

4       Defendants urge the court to look at other documents and

5  BiOps, which they argue, shows that they fulfilled their ESA

6  obligations.  Both Friant and Federal defendants cite to the

7  agencies' 2000 programmatic BiOp on CVPIA to argue that the 2000

8  ─────────────────

9  implementing regulations. Allowing such a process in a procedural
   statute which requires no particular result makes staged analysis
   acceptable.  ESA, however, is an action-forcing statute, turning
10 on identified prohibited consequences of government action, both
   direct, indirect, and interrelated effects.  Tiering, however,
11 i.e., staged analysis, will tend to obscure the ability of the
   agency to identify the direct and indirect consequences of
12 particular action, and thus tend to obscure when government action
   is prohibited. Moreover, it is established that segmented analysis
13 is prohibited in an ESA context.  <u>Connor v. Burford</u>, 848 F.2d 1441,
   1453-54 (9th Cir. 1988)(holding that FWS was required to consider
14 consequences of all stages of oil and gas activity in rendering a
   biological opinion).  The difficulty in distinguishing between
15 prohibited segmentation, and permitted tiering, was illustrated
   during oral argument relative to the motion at bar.
16      Unfortunately, the <u>Gifford Pinchot</u> court failed to explain how
   a "tiered analysis" will be applied in an ESA case, and many
17 questions are unanswered.  The court notes that only two other
   cases have ever discussed a "tiered" analysis in the ESA context,
18 <u>Buckeye Forest Council v. United States Forest Serv.</u>, 337 F.Supp.2d
   1030, 1036 (S.D. Ohio 2004)(concluding that it is not clear that
19 tiered consultation fulfills defendants' ESA obligations) and
   <u>Pacific Coast Fed'n of Fishermen's Ass'n's v. Nat'l Marine</u>
20 <u>Fisheries</u>, No. 97-CV-775, 1998 WL 1988556 (W.D. Wash. May 29,
   1998)(applying tiered analysis).  Given that the <u>Gifford Pinchot</u>
21 court cited a NEPA case in its approval of "tiered analysis," this
   court will assume that tiered analysis under ESA will be conducted
22 in a manner analogous to that conducted under NEPA.  In that
   regard, NEPA's regulations describe "tiering" as "refer[ring] to
23 the coverage of general matters in broader environmental impact
   statements (such as a national program or policy statements) with
24 subsequent narrower statements or environmental analyses (such as
   regional or basin-wide program statements or ultimately site-
25 specific statements) incorporating by reference the general
   discussions and concentrating solely on the issues specific to the
26 statement subsequently prepared." 40 C.F.R. § 1508.28.

programmatic BiOp was supplemented by the 2001 BiOps, which
served as project-specific environmental analysis.  As I now
explain, even with this tiered consultation, defendants have not
met their obligations under ESA.

    With regard to the winter-run chinook and critical habitat,
Federal defendants assert that NMFS initially considered
critical habitat in the 2000 Programmatic BiOp, but admit that
the BiOp stated that the long-term contract renewals would be
subject to a separate, tiered analysis.[28]  Fed. Defs.' Br. at 12.
There is no mention of, much less extensive discussion of,
"recovery" in this passage.  Clearly, it is insufficient to
overcome the Ninth Circuit's presumption.

    In addition to citing the passage from the 2000 BiOp,
defendants attempt to overcome Gifford Pinchot's presumption by
referencing a section of NMFS's 2001 BiOp which discusses
alleged improvements in the environmental baseline.[29]  While this

_____

[28]  The passage that Federal defendants cite to in NMFS's
November 14, 2000 programmatic BiOp explains that "the proposed
implementation of the CVPIA . . . are anticipated to beneficially
affect Sacramento River winter-run chinook salmon, Central Valley
spring-run chinook salmon, Central Valley steelhead, and their
designated critical habitat."  See BORESA 029586. The BiOp also
explicitly states that new CVPIA project actions which may affect
listed Central Valley anadromous salmonids or critical habitats
will be addressed through future individual section 7
consultations." Id.

[29]  The NMFS BiOp states that:

    There also has been and will continue to be improvements
    in  the  environmental  baseline  as  a  result  of
    implementation of CVPIA anadromous fisheries restoration
    plan  and  (b)(2) provision.   Also implementation of
    CALFED's ecosystem restoration program and environmental

30

section of the BiOp mentions "improving habitat" and

"restoration," it is clear that NMFS's discussion of improving

habitat occurs in the context of the environmental baseline,

rather than in the context of protection of habitat critical for

the species' recovery.[30]   The Services, however, must analyze

---

> water account have improved the environmental baseline
> by improving habitat, increasing habitat, increasing
> survival of juvenile salmon and steelhead, and providing
> tools to minimize the direct and indirect effects of the
> delta pumping facilities.   This improvement in the
> environmental base line increases the resiliency of the
> listed salmon populations to the effect of deliveries
> pursuant to these contracts and provides resources to
> provide habitat for spawning and rearing of steelhead in
> the Stanislaus and Tuolumne Rivers, despite the
> potential for reduction in flow from Friant to increase
> demands on these Rivers for contributions to pulse
> flows.

BORESA 041555.

[30]   The environmental baseline for Section 7 consultation
purposes is defined as follows:

> The environmental baseline includes the past and present
> impacts of all federal, state, or private actions and
> other human activities in the action area, the
> anticipated impacts of all proposed federal projects in
> the action area that have already undergone formal or
> early section 7 consultation, and the impact of state or
> private actions which are contemporaneous with the
> consultation in process.

50 C.F.R. § 402.02.

In other words, the environmental baseline is a "snapshot in
time," which allows agencies to understand existing conditions
before they consider the effects of a proposed action on those
conditions. See Tony A. Sullins, ESA Endangered Species Act, Basic
Practice Series, 2001 (American Bar Association Publishing), at 68-
69.   As plaintiffs explain, NMFS's BiOp contains no discussion of
how and whether these improvements in the baseline affect the value
of critical habitat for recovery.   Pls.' Br. at 21.   Further, as
plaintiffs note, a listed species may experience improvements in
the environmental baseline and still not recover.   See 16 U.S.C.

1  "recovery in the context of critical habitat, the sense in which

2  recovery evaluation is required by the ESA," rather than in

3  another context.  <u>Gifford Pinchot</u>, 378 F.3d at 1074 (rejecting

4  discussion of "recovery" as it is "promoted by the [National

5  Forest Plan]," a comprehensive programmatic BiOp).  The Court

6  explained that there must be "discussion of the specific impact"

7  of the proposed action – here the contract renewals – on

8  critical habitat and recovery of the species.  It emphasized

9  that this distinction is important, especially "when considered

10 in the context of the agency's regulation and the presumption of

11 regularity."

12     Federal defendants also point to a passage discussing the

13 indirect effects, including reverse flows and cross delta

14 transport of water, of the contract renewals on the winter-run

15 chinook.  <u>See</u> BORESA 041554.  Nowhere in this passage, however,

16 does NMFS discuss or even mention recovery of winter-run chinook

17 or the contract renewals' impact on critical habitat.  I

18 conclude that the defendants have not borne the burden of

19 demonstrating that its reliance on the erroneous regulatory

20 definition of "adverse modification" was harmless.  The critical

21 habitat analysis of the winter-run chinook salmon is therefore

22 fatally flawed.

23 ////

24 ////

25 ─────────────────

26 § 1532(3) ("recovery" means ESA protections are no longer
   necessary").

                                32

1        **3.    <u>Listed Terrestrial and Freshwater Species' Recovery</u>**
        **<u>(Plaintiffs' Fifth Claim)</u>**
2

3        It is undisputed that, at the time of the consultation at

4   issue, FWS had designated critical habitat for at least seven

5   species, the California condor, Delta smelt, Fresno kangaroo

6   rat, least Bell's vireo, Little Kern golden trout, Southwestern

7   willow flycatcher, and Valley elderberry longhorn beetle.

8   BORESA 039978-80.  Plaintiffs contend that under <u>Gifford</u>

9   <u>Pinchott</u>, defendants' analysis of adverse modification of

10  critical habitat for these species was improper.  I now address

11  defendants' various arguments in opposition to plaintiffs'

12  contention.

13       As Friant defendants maintain, plaintiffs failed to

14  provide the 60-day notice of ESA violation as to the California

15  condor, the least Bell's vireo, and the Southwestern willow

16  flycatcher.  Accordingly, they argue, a condition precedent to

17  suit has not been fulfilled.

18       Section 11(g) of ESA permits citizens suits to enforce

19  compliance with the Act.  16 U.S.C. § 1540(g).  Before such a

20  suit, however, plaintiff must give the Secretary of the Interior

21  and any alleged violators written notice of intent to sue sixty

22  days prior to filing.  This requirement is jurisdictional.  <u>Save</u>

23  <u>the Yaak Comm. v. Block</u>, 840 F.2d 714, 721 (9th Cir. 1988).  As

24  just noted, plaintiffs here did not do so as to certain species.

25  The question, however, is whether this aspect of plaintiffs'

26  suit is properly viewed as a citizen suit.

1    In <u>Bennett v. Spear</u>, 520 U.S. 154 (1997), the Supreme Court

2 held that suits against the Secretary of the Interior, acting in

3 his capacity as Administrator of ESA, which challenge the

4 adequacy of biological opinions are not necessarily citizen

5 suits under 11(g) of the Act.  Rather, the Court held, such

6 claims could be pled under the Administrative Procedure Act,

7 which authorizes courts to set aside agency actions found to be

8 "arbitrary, capricious, an abuse of discretion or otherwise not

9 in accordance with the law."  <u>Id.</u> at 177.

10    In conformance with the <u>Bennett</u> holding, the Ninth Circuit

11 has instructed that so long as it is properly pled under the

12 APA, challenges to the adequacy of biological opinions can be

13 pursued notwithstanding a failure to meet the sixty-day notice

14 requirement.  <u>American Rivers v. Nat'l Marine Fisheries Serv.</u>,

15 126 F.3d 1118, 1124 (9th Cir. 1997).  Plaintiffs have pled both

16 APA and ESA claims against the agencies relative to the asserted

17 deficiencies of the BiOps, and thus the court has jurisdiction

18 to consider any claims that those biological opinions are

19 inadequate.[31]

20    As noted, FWS designated critical habitat for at least

21 seven species considered in this consultation.  BORESA 039978-

22

23    [31]  Once again, this court is perplexed by a holding of courts
by which it is bound.  The APA provides a right to judicial review
24 of all "final agency action for which there is no other adequate
remedy in a court."  5 U.S.C. § 701(a).  On the face of it, ESA's
25 citizen suit provisions provide an adequate remedy and thus would
appear to preclude suit under the APA.  <u>See</u> <u>Middlesex County Sewage</u>
26 <u>Authority v. National Seaclammers Association</u>, 453 U.S. 1 (1981).

34

1    80.  Plaintiffs contend that defendants summarily concluded that
2    the proposed action would not "adversely modify" critical
3    habitat without considering recovery, or did not come to any
4    conclusion as to the species.[32]

5         Federal defendants assert that the designated critical
6    habitat was not within the action area encompassed by the
7    consultation and so it was not affected by the proposed action.
8    Fed. Defs.' Br. at 14.  They cite to various passages in the
9    2001 BiOp which they assert shows that these species' "critical
10   habitat is not within the action area," and thus, they contend,
11   FWS's "no adverse modification" conclusion was "reasonable."
12   Id. at 14-15.  I cannot agree.

13        I begin by noting that defendants' argument that the
14   contract renewals would have no effect on critical habitat
15   because the habitat lies outside of the Friant contract service
16   areas is undermined by the BiOp.  FWS explained there that the
17   contracts' impact extends beyond the contract area by virtue of
18   both direct and indirect effects.[33]  Pls.' Br. at 24.
19   Defendants' argument fails for yet another reason.

20        In those cases where the FWS articulated a reason for its
21   conclusion, it did not articulate Federal defendants' litigation

22   _____

23        [32]  As plaintiffs point out, FWS did not even reach an adverse
     modification conclusion as to the Least Bell's Vireo.  The court's
24   review of the record supports this allegation, and it also appears
     that FWS failed to reach a conclusion on adverse modification as
25   to the Little Kern Golden Trout.

26        [33]  For ESA Section 7 purposes, the agencies must examine both
     the "direct" and "indirect effects."  50 C.F.R. § 402.02.

                                   35

1  position as the reason why it determined that some of these

2  species would not be adversely affected.[34]  Put bluntly,

3  defendant's litigation position is besides the point.  The

4  question is whether the articulated reasons in the record

5  demonstrate that FWS' decisions were based on a consideration of

6  the relevant factors, and whether FWS articulated a rational

7  connection between the facts found and the decisions.  <u>Nev. Land</u>

8  <u>Action Ass'n v. United States Forest Serv.</u>, 8 F.3d 713, 716 (9th

9  Cir. 1993).

10     <u>Gifford Pinchot</u> made clear that in considering whether the

11  proposed action adversely modifies critical habitat, FWS must

12  consider both the species' survival and recovery.  Thus, as with

13  the spring-run chinook salmon, this court must determine whether

14  FWS ignored its own regulation and considered both recovery and

15  survival in its adverse modification analysis for each species.

16  Below, the court does so for each of the listed species with

17  critical habitat.

18                    **a.  California Condor**

19     FWS concluded that the proposed action would not adversely

20  modify the critical habitat of the California Condor, even

21  though there is scant discussion of the condor's habitat.  The

22  BiOp notes that the decline of condor population is "attributed

23  to human persecution, pesticide use, lead poisoning, and habitat

24  loss." BORESA 040050-51.  The BiOp, however, appears to contain

25  ─────────────

26     [34]  In many cases, the agency did not articulate any reason
   for its conclusion.

                              36

1  no discussion whatever of the effect of the contract renewal on

2  "critical habitat," much less mention of recovery or

3  conservation.  Defendants insist that because the condor's

4  habitat is not within the action area it is not affected

5  negatively by the proposed action.  Again, if defendants'

6  litigation position was the basis for FWS determination the

7  agency was required to say so in the BiOp, and support that

8  reasoning with a meaningful analysis.  The court "cannot infer

9  that analysis was conducted but not described in the BiOp."

10  Gifford Pinchot, 378 F.3d at 1074.

11          **b.  <u>Delta Smelt</u>**

12      Plaintiffs admit that FWS did discuss "recovery" in

13  connection with its effects analysis for the Delta smelt, but

14  they argue that the discussion is inadequate.  In light of

15  Gifford Pinchot, the court must agree.

16       The BiOp states that the "renewal of contract [sic] would

17  also adversely impact" the Delta smelt, and although the

18  contracts would "slow down" the Delta smelt's recovery, certain

19  unspecified "commitments' made by the Bureau in the context of

20  an earlier consultation on CVP operations would allow "eventual"

21  recovery of the smelt.  BORESA 040125.  Although, as plaintiffs

22  concede, this is the most in-depth analysis provided by FWS as

23  to any of the listed species with designated critical habitat,

24  the discussion is insufficient for several reasons.

25      I begin by noting that while the BiOp acknowledges that the

26  contracts will slow down recovery of the smelt, there is no

37

1  connection drawn between this adverse impact and its

2  ramifications on the critical habitat of the species.  Moreover,

3  as plaintiffs assert, the analysis must not focus on whether

4  eventual recovery is possible, but whether the value of the

5  habitat is "diminishe[d]" for a species' recovery.  50 C.F.R.

6  § 402.02.  Finally, FWS's BiOp offers no factual support for its

7  contention that recovery remains possible.  Under the APA,

8  defendants must make a connection between the facts found and

9  conclusion drawn.  There are no facts provided for the assertion

10 that recovery is possible.  In sum, the BiOp is simply

11 inadequate by any measure.

12              **c.  Fresno Kangaroo Rat**

13     Federal defendants argue that FWS has met its burden as to

14 the Fresno kangaroo rat because the BiOp states that the Fresno

15 kangaroo rat's recovery was discussed in the Upland Recovery

16 Plan.  BORESA 040059.  The parties did not submit the Upland

17 Recovery Plan for the court's consideration (or, at the very

18 least, it was not easily found by the court) - thus, it is

19 unclear what the Upland Recovery Plan actually discussed.[35]

20 Moreover, even if the plan were submitted and it had some in

21 depth discussion as to the kangaroo rat, this would be

22

23     [35]  The massive administrative record required the court to
24 warn the parties that a reference to a document which does not
   contain a citation to that record will be treated as an admission
   that the document is not contained within that record.  As the
25 Seventh Circuit has aptly remarked " [j]udges are not like pigs,
   hunting for [buried] truffles . . . ."  United States v. Dunkel,
26 927 F.2d. 955-56 (7th Cir. 1991).

1  insufficient to meet ESA's requirements because FWS would need

2  to draw a connection between the Upland Recovery Plan and the

3  adverse modification standard within the four corners of the

4  BiOp.

5      The court does note that "critical habitat" is mentioned

6  with respect to the Fresno kangaroo rat. The BiOp states that

7  "[c]ritical habitat designated for the species lies about 7

8  miles west of Fresno ID," and that "[a]ppropriate habitat

9  management of protected lands . . . is also urgently needed."

10  BORESA 040117.  Although "critical habitat" is mentioned, it is

11  discussed in a more general context - on measures to improve the

12  species's state over all - and thus the FWS did not address the

13  contract renewal's "specific impact" on the Fresno kangaroo's

14  critical habitat and its recovery, as <u>Gifford Pinchot</u> requires.

15  <u>See</u> 378 F.3d at 1074.  Indeed, it appears that the "proposed

16  contract renewal" is not even mentioned in the discussion of

17  this species.  Common sense as well as binding precedent

18  dictates that "even the mention of 'recovery' does not indicate

19  analysis of recovery in the context of critical habitat."  <u>Id</u>.

20  at 1074.  I conclude that FWS has not shown that it ignored its

21  unlawful regulatory definition in its discussion of the Fresno

22  kangaroo rat.

23          **d.  <u>Little Kern Golden Trout and Least Bell's Vireo</u>**

24      Beyond explaining where the Little Kern Golden Trout's

25  critical habitat is located, <u>see</u> BORESA 040071, the only other

26  mention of the species in the entire BiOp is where FWS admits

1  that it "has no information on possible effects from pesticide

2  drift on the Little Kern River golden trout,"  BORESA 040120.

3  This one mention insufficiently meets <u>Gifford Pinchot</u>'s mandate

4  that the BiOp must discuss the federal action's impact on the

5  species' recovery.

6        As for the least Bell's vireo, the BiOp explains that "the

7  least Bell's vireo has sufficient populations in their southern

8  range to sustain the species in the foreseeable future," and

9  that "restoration of riparian habitat in the San Joaquin Valley

10  was identified as a critical task to recovery."  There is no

11  further analysis of these species.  Although "recovery" is

12  mentioned in one sentence in the context of critical habitat as

13  to the least Bell's vireo, that is hardly sufficient to rebut

14  the presumption that FWS ignored its adverse modification

15  regulation.  Moreover, even if the reference were somehow

16  sufficient, FWS failed to draw any conclusion as to adverse

17  modification for the least Bell's vireo even though the BiOp

18  acknowledges that critical habitat was designated for the

19  species.  It is not surprising that with the complete absence of

20  analysis for the Little Kern golden trout, FWS also failed to

21  reach a conclusion as to adverse modification for the Little

22  Kern Golden trout, even though it was listed as a species with a

23  critical habitat designation.[36]   BORESA 039979.

24  _____

25        [36]  The section of the opinion that articulated conclusions as
   to the critical habitat of the other species does not mention the
   Little Kern Golden Trout or the Least Bell's Vireo.  BORESA 040128.
26  It might be argued that FWS concluded that there was no adverse

1              **e.    <u>Southwestern Willow Flycatcher & Valley</u>**
                      **<u>Elderberry Longhorn Beetle</u>**

2

3       FWS concluded that the renewal of the contracts would not

4  adversely modify the critical habitat of the southwestern willow

5  flycatcher and the valley elderberry longhoron bettle.  BORESA

6  040128.  Defendants assert that FWS did not have to engage in

7  the required adverse modification analysis set forth in <u>Gifford</u>

8  <u>Pinchot</u> because these two species' habitat were outside the

9  contract service areas.  As discussed above, this argument

10 fails.  Again, even if this contention represented a viable

11 defense, the BiOp was required to contain a rational connection

12 between such a conclusion and the facts it relied upon.  It did

13 not and, as noted, defendants cannot now make a post-hoc

14 connection for FWS.  <u>Gifford Pinchot</u>, 378 F.3d at 1074.

15      The court has independently examined the BiOp and although

16 FWS did mention "recovery" and "critical habitat" as it relates

17 to these two species, it failed to discuss recovery in the

18 critical habitat context, as required under <u>Gifford Pinchot</u>.

19 The BiOp notes that "restoration of riparian habitat along the

20 Central valley" would be "critical to the recovery of these

21 species." BORESA 040125.  At best, it may be said that

22 "recovery" is discussed in a very general way but FWS failed to

23 ─────────────────────

24 modification through its silence, a conclusion this court may not
   draw.  "We cannot infer an agency's reasoning from mere silence,"
   that "in considering the BiOps, we may only rely on what the agency
25 said in the record to determine what the agency decided and why."
   <u>Gifford Pinchot</u>, 378 F.3d at 1072 (citing <u>Beno v. Shalala</u>, 30 F.3d
26 1057 (9th Cir. 1994)).

1  analyze how the contract renewals would actually impact the

2  species' critical habitat.[37]

3      In sum, as with the critical habitat analysis for the

4  winter-run chinook salmon, the critical habitat analyses as to

5  the other listed species is insufficient.  Given the failure of

6  the record to rebut the presumption that the Services relied on

7  an invalid regulation, I conclude that the NMFS and FWS 2001

8  BiOps were arbitrary and capricious because they failed to

9  adequately discuss the "adverse modification" prong required

10 under the Endangered Species Act.

11 **C.   THE AGENCIES'S JEOPARDY ANALYSIS**

12     In addition to challenging the consulting agencies'

13 critical habitat analysis, plaintiffs also object to their

14 jeopardy analyses on a number of grounds.  I turn to those

15 contentions.

16     Section 7(a)(2) of ESA, 16 U.S.A. § 1536(a)(2), requires

17 that the Secretary of the Interior ensure that an action of a

18 federal agency is not likely to jeopardize the continued

19 existence of any threatened or endangered species.[38]  Section

20 _____

21     [37]   Friant defendants urge this court to consider FWS's 2000
   programmatic BiOp for the CVPIA where FWS explained that "[t]hus,
22 restoration of riparian habitat along the Central Valley, their
   historical habitat, is critical to the recovery of these species."
   Assuming arguendo that a tiered analysis under these circumstances
23 is appropriate, the language from the 2000 BiOp failed to discuss
   recovery in the context of the proposed action's effects on the
24 species' critical habitat, as <u>Gifford Pinchot</u> requires.

25     [38]   "'Jeopardize the continued existence of' means to engage
   in an action that reasonably would be expected, directly or
26 indirectly, to reduce appreciably the likelihood of both the

                                  42

1  7(b) sets out a process of consultation requiring the agency

2  with jurisdiction over the protected species to issue to the

3  Secretary a "biological opinion" evaluating the nature and

4  extent of jeopardy posed to that species by the action, 16

5  U.S.C. § 1536(b), after the action agency provides the Secretary

6  with "the best scientific and commercial data available."  16

7  U.S.C. § 1536(a)(2).  If the biological opinion concludes that

8  the proposed action is likely to jeopardize a protected species,

9  the action agency must modify its proposal.

10      **1. The Services' Effects Analysis (Plaintiffs' Fifth Claim)**

11      Plaintiffs' first contention is that FWS failed to consider

12  all of the effects of the renewed contracts.  They maintain that

13  FWS failed to consider the effects of interrelated and

14  interdependent operations and maintenance activities, and that

15  it failed to render a BiOP on the effects of water delivery

16  amounts actually authorized by the water contracts.

17      **a.   Effects of Interrelated and Interdependent
            Operations and Maintenance**

18

19      In fulfilling its interagency consultation obligations

20  under § 7 of the ESA, the consulting agency must consider the

21  "entire agency action."  Conner v. Burford, 848 F.2d 1441, 1453-

22  54 (9th Cir. 1988).  This includes the effects of the federal

23  _____

24  survival and recovery of a listed species in the wild by reducing
    the reproduction, numbers or distribution of that species."
25  Interagency Cooperation – Endangered Species Act of 1973, as
    amended, 51 Fed.Reg. 19,958 (1986)(codified at 50 C.F.R. § 402.02)
26  (1986)).

1  action along with the impact of "interrelated and

2  interdependent" actions.  50 C.F.R. § 402.02(d).[39]  The test for

3  interrelated or interdependent effects is "but for" causation,

4  *i.e.*, but for the proposed action, would the other action occur.

5  51 Fed.Reg. 19932 (1986); Sierra Club v. Marsh, 816 F.2d 1376,

6  1387 (9th Cir. 1987).

7       In Connor, the Circuit explained that FWS was required to

8  consider the consequences of all stages of oil and gas activity

9  in rendering a BiOP. 848 F.2d at 1453-54.  The court concluded

10 that FWS's decision to utilize "incremental-step consultation"

11 was a breach of its duty since such an approach "did not

12 consider all phases of the agency action."  Id. at 1453.  The

13 court emphasized that "agency action" is to be interpreted

14 "broadly," because "[c]aution can only be exercised if the

15 agency takes a look at all the possible ramifications of the

16 agency action."  Id.

17      Here, plaintiffs contend that FWS excluded consideration of

18 interrelated and interdependent operations and maintenance

19 activities, despite the subject action being part of a larger

20

21      [39]  "Effects of the action" refers to direct and indirect
effects of an action on the species or critical habitat, together
22 with the effects of other activities that are interrelated or
independent with that action, that will be added to the
23 environmental baseline.  Indirect effects are those that are caused
by the proposed action and are later in time, but still are
24 reasonably certain to occur.  Interrelated actions are those that
are part of a larger action and depend on the larger action for
25 their justification.  Interdependent actions are those that have
no independent utility apart from the action under consideration.
26 50 C.F.R. § 402.02.

1  agency action.  Plaintiffs observe that FWS's BiOp identifies

2  thirteen activities that were excluded from the consultation

3  which, they assert, may adversely impact listed species and

4  their habitats.  Pls.' Br. at 30-31, citing BORESA 039977.  The

5  court finds that the record supports the conclusion that FWS

6  unlawfully segmented its consultation.

7      The 2001 BiOp acknowledges that the "no jeopardy opinion"

8  did not consider "Operation and Maintenance on Federal and

9  District lands used to convey CVP water" and "Operation and

10 Maintenance Plans."  BORESA 039977.  These actions, it asserted,

11 "will require separate determinations regarding their potential

12 effects on threatened and endangered species and critical

13 habitat pursuant to section 7 . . . ."  Id.  In the

14 "commitments" section of the BiOp, where FWS explained the

15 measures that it assumed would be "fully implemented," the BiOp

16 acknowledged that operation and maintenance activities "have

17 been addressed using a phased approach."[40]  In making this

18 commitment to address operation and maintenance activities, FWS

19 acknowledges the potential impacts of these activities on

20  _____

21      [40]  FWS explained that "phase I" consisted of "procedures
which are to be followed on United States lands administered by
Reclamation," that "phase II" "addresses the identification of
22 sensitive sites and the creation of site-specific measures to avoid
adverse impact to those species," and that "phase
23 III . . . establish[ed] Integrated Pest Management procedures and
the implementation of erosion control plans."  BORESA 040027.  The
24 schedule for beginning implementation of phase I was three months
following the date of the Friant opinion, and phase II and III were
25 to begin by the end of 2001.  Id.  FWS claimed that Operations and
Maintenance Manuals would be distributed to Districts "within 1
26 year of this opinion."  Id.

1  species. (The BiOp provides that "phase II" was dedicated to

2  addressing "sensitive sites" and the creation of measures to

3  "avoid adverse impact to those species." Id.). As I now

4  explain, however, the record also demonstrates that operations

5  and maintenance activities were interrelated and interdependent

6  actions which had the potential to adversely impact protected

7  species, and thus should have been included in the consultation.

8      The BiOp recognizes that operation and maintenance of

9  canals is a part of the agency action because it is part of the

10  water delivery process. See USBR ESA AR 039981 (water for the

11  Friant Division is impounded behind Friant Dam and then

12  "released to the 152-mile long [Friant Kern Canal] which flows

13  south and to the 36-mile long [Mader Canal] which flows north.

14  FWS AR 08022253 (Bureau's Biological Assessment on Long-Term

15  Contract Renewal states that study area for Section 7

16  consultation includes "Friant-Kern Canal, and the Madera

17  Canal"). In a memorandum from Laura Allen, Deputy Regional

18  Environmental Office, to Field Supervisor, U.S. Fish & Wildlife

19  Service (November 25, 2002), where the Bureau requested

20  consultation on implementing an operations and maintenance plan

21  committed to in the 2001 FWS BiOp, "operations and maintenance

22  of facilities" was described as:

23          . . . functioning to protect the integrity of the
            canal and distribution systems so that the structures
24          may operate efficiently and safely. Routine
            maintenance activities of the canal rights-of-way
25          include, but are not limited to, filling erosion
            gullies and holes, use of herbicides, and use of
26          rodenticides to prevent damaging burrowing activity by

46

1    ground squirrels.  Adverse impacts to listed species
    can also be caused by some of these activities if they
2    are not performed properly with environmental concerns
    taken into consideration.
3

4  Exhibit 3 to Pls.' Motion to Augment Record (Nov. 19, 2004).[41]

5  Because the delivery of water under the contracts cannot be

6  accomplished without the use of canals, operations and

7  maintenance activities are "interrelated actions," or actions

8  which are part of a larger action and depend on the larger

9  action for their justification.  50 C.F.R. § 402.02.  "ESA

10  requires that the biological opinion detail how the agency

11  action affects the species or its critical habitat."  Connor,

12  848 F.2d at 1453 (internal quotation omitted).  The impact of

13  operations and maintenance activities – such as construction,

14  earth moving, erosion control, and pesticide control – have far-

15  reaching and adverse consequences for protected species.[42]  FWS

16

17  [41]  Friant defendants argue that this record is irrelevant
because it describes "the Field Operations Manual developed by the
18  South Central California Area Office (SCAAO) of the Bureau of
Reclamation" and not "the operation and maintenance of the Friant-
Kern Canal or the Madera Canal."  They appear to be in error.
19  SCAAO includes the Central Valley Project facilities (including the
Madera Canal and the Friant-Kern Canal), the Cachuma Project, Santa
20  Maria Project, and the Ventura River Project.  See Board of
Reclamation Website, *available at*
21  http://www.usbr.gov/mp/area_offices.html (viewed on April 5, 2005).
  Clearly, the "Field Operations Manual" is relevant in
22  considering the potential impacts of Operations and Maintenance
activities because it lays out the potential impact of such
23  activities and is "intended for use by Reclamation field staff and
for entities contracted to protect and maintain Reclamation
24  facilities."

25  [42]  According to the operations and maintenance manual,
"[h]erbicide treatment of plants that provide food or habitat for
26  listed species could cause death or injury to some individuals of

1  failed to comply with ESA by not including in its BiOp how

2  operations and maintenance activities affect species and its

3  critical habitat.

4        Federal defendants contend that FWS complied with ESA and

5  that the plaintiffs' argument is a "red herring" because they

6  have completed four O&M manuals, which provide the framework for

7  the Bureau and contractors to conduct future maintenance

8  activities.  Beyond that, they maintain, an action agency is not

9  required to "engage in speculation in an attempt to identify

10 potential adverse effects." Fed. Defs.' Br. at 21.  Friant

11 defendants make a similar argument, responding to plaintiffs'

12 argument by asking: "How in the world is Reclamation supposed to

13 consult with FWS - other than programmatically - about erosion

14 gullies, gopher holes, and the burrowing activity of ground

15 squirrels?  Which gullies?  Which gopher holes?  Which squirrel

16 burrows? . . ."  Friant Defs.' Br. at 48.

17       Defendants maintain that FWS ultimately satisfied ESA

18 because operations and maintenance activities were

19 considered in FWS's November 2000 Programmatic Biological

20 Opinion.  Friant Defs.' Br. 45-46.  The argument is not

21 persuasive.

22 _____

23 those species," ground disturbance associated with routine
   maintenance "can crush or bury animals and plants and destroy
24 burrows" of listed species," "[d]irect feeding upon any rodenticide
   bait would likely kill or cause serious injury to any animal,"
25 application of herbicides may also "have direct adverse effects
   upon amphibians through contact with their skin."  Ex. 3 to Pl.'s
26 Motion to Augment Record (Nov. 19, 2004).

1    It is important to note that the 2000 BiOp discussion is to

2  be used only for "programmatic purposes."  The O&M discussion

3  spans approximately 3 pages and is very general in nature,

4  describing future commitments and consultations.  Further,

5  although the 2000 BiOp made clear other documents could be

6  tiered from it, the BiOp also made clear that it could not be

7  used to supplant the analysis required for actions, such as the

8  long-term contract renewal, which required separate section 7

9  analysis ("It is understood that these provide only general

10  information and the Service and Reclamation will work together

11  on site specific needs for operation and maintenance actions").

12  BORESA 052990.

13    While it is true that FWS and the Bureau could not have

14  known about all the potential impacts of individual O&M

15  activities, this argument misses the mark.  The law requires

16  consideration of the effects of interrelated and interdependent

17  activities whether or not all of the activities' impact is

18  known.  ESA requires that BiOps consider the entire agency

19  action.  <u>Sierra Club v. Marsh</u>, 816 F.2d 1376, 1387 (9th Cir.

20  1987).  Here, it is undeniable that maintenance activities

21  allowed for the water delivery under the contracts and would not

22  have occurred "but for" the renewal of the contracts.  FWS's

23  "phasing approach" to O&M activities was "not coextensive with

24  the agency action" and was therefore arbitrary, capricious and

25  ////

26  ////

1    not in accordance with the law.  Connor, 848 F.2d at 1457-58.[43]

2    The court wishes to be clear, it may well be that some O&M

3    activities could not be accounted for in the BiOp because they

4    were unknown.  The fact that extensive O&M activities was

5    absolutely certain, however, requires that the activities be

6    analyzed under § 7.

7              **b.  FWS's Use of Historical Average Water Deliveries**

8         Plaintiffs contend that FWS's jeopardy opinion should be

9    set aside on yet another ground.  They argue that FWS consulted

10   on an amount of water that is significantly less than what was

11   authorized by the water contracts.  They maintain that § 7

12   requires that the action agency consult, and that FWS render

13   BiOps on the effects of the action that is actually authorized

14   by the action agency.  50 C.F.R. §§ 402.02, 402.14.[44]   The

15

16        [43]   In American Rivers v. United States Army Corps of
     Engineers, 271 F.Supp.2d 230, 255 (D.D.C. 2003), the court

17   explained why segmented consultations do not conform to the
     requisites of the statute:

18        If FWS were allowed to apply such a limited scope of
          consultation to all agency activities, any course of
19        agency action could ultimately be divided into multiple
          small actions, none of which, in and of themselves would
20        cause    jeopardy.    Moreover    such    impermissible
          segmentation would allow agencies to engage in a series
21        of limited consultations without ever undertaking a
          comprehensive assessment of the impacts of their overall
22        activity on protected species.

23        [44]  "Action" means all activities or programs of any kind
     authorized, funded, or carried out, in whole or in part, by Federal
24   agencies in the United States or upon the high seas. Examples
     include, but are not limited to: (a) actions intended to conserve
25   listed species or their habitat; (b) the promulgation of
     regulations; (c) the granting of licenses, contracts, leases,
26   easements, rights-of-way, permits, or grants-in-aid; or (d) actions

                                   50

1  record reflects that FWS failed to do so, instead consulting on

2  approximately less than half of what was authorized in the long-

3  term contracts.

4       Defendants maintain that the regulation is in the

5  alternative, "*authorized, funded, or carried out*", and the

6  agencies consulted on the amount of water actually to be

7  delivered as determined by historic deliveries, i.e., "carried

8  out."  Even assuming that the regulation is in the alternative,

9  the argument fails.

10      It is clear that the language "carried out" is

11 retrospective, and thus is not relevant to the matter at bar,

12 which is the consummation of contracts for the future delivery

13 of water.  Because the contracts are for future delivery, and

14 the amount of water actually to be delivered will vary from year

15 to year and is thus uncertain, the only alternative which

16 applies is the amount of water authorized to be delivered by

17 those contracts.  Put another way, the contemplated action is

18 the execution of the water contracts.  That execution will

19 authorize the delivery of water, but clearly the execution of

20 the contracts will not, in itself, carry out that delivery.  As

21 I now explain, given this conclusion, the BiOp was inconsistent

22 was the agencies' ESA duties.

23 *////*

24 ─────────────────────

25 directly or indirectly causing modifications to the land, water,
   or air. 50 C.F.R. §402.02.  The agencies must consult on the
   effects of "the action" and cumulative effects on the listed
26 species or critical habitat.  50 C.F.R. § 402.14.

The Friant long-term contracts cumulatively authorized the Bureau to deliver more than 2.1 million acre-feet of water per year, for twenty-five years.[45]  Rather than analyzing the effects of 2.1 million acre-feet of water delivery, FWS explained that its "effects analysis is conducted under the expectation that water will be delivered to CVP service contractors in quantities that approximate historic deliveries (1988 through 1997), as given in Appendix D of the November 21, 2000 programmatic long-term CVP contracts consultation."  This assumption was made, the BiOp explained, because "delivery of full contract quantities is unrealistic." BORESA 040105.  An examination of Appendix D reveals that the historic deliveries for the water districts at issue totaled over 850,000 acre-feet.[46]  Further, Table 1.4, which is included in the 2001 BiOp and which lists the Friant Division and Cross Valley Water Contractors, puts the historic annual deliveries at 799,411 for the Friant districts and 53,574

---

[45]  The BiOp states that "[f]ull entitlements" under the contract are 2,115,975 acre-feet for the Friant Division and 128,300 acre-feet for the Cross-Valley Division. BORESA 039991. However, as plaintiffs point out, FWS used several different figures in describing the full quantity of water to be delivered. In Table 1.4 of the BiOp, the "Total of All Entitlements" is listed as 2,141,475 acre-feet, BORESA 039994, and where the Opinion incorporates the contract quantities that were used in "Appendix D" of an earlier consultation, the total contract quantities exceed 2.18 million acre-feet. BORESA 040105; BORESA 047873. While these numbers vary slightly in the record, the court is satisfied that the full quantity of water authorized by the contracts exceeded 2.1 million acre-feet.

[46]  Appendix D lists all the CVP Contractors, rather than just the CVP contractors involved in this dispute, but based on what the court can tell, the amount of water consulted on is somewhere between 850,000 and 950,000 acre-feet.

1  acre-feet for the Cross Valley Contractors.  BORESA 039993-

2  039995.

3       Even though it is unclear what the exact amount of the

4  historic annual delivery was between 1988 and 1997 for all of

5  the water districts at issue, it appears clear that the amount

6  was approximately half of what the water districts were

7  authorized to receive through the contracts.  Simply put, FWS

8  did not evaluate the effects of the entire authorized agency

9  action.  Significantly, on the same day that the FWS BiOp was

10 issued, Frank Michny, of the Bureau of Reclamation, e-mailed an

11 FWS scientist, that:

12       Our view is that we are consulting on full contract
         amts for each district, recognizing that total
13       deliveries in certain areas may be limited by OCAP.
         We will agree that we will consult on any BOR action
14       that may affect listed species . . . If changing
         project description to above results in a J[eopardy]
15       opinion I have been informed, "so be it."

16 FWS AR 08023996.[47]

17      Just hours before the FWS BiOp was to be issued, the

18 Bureau's regional environmental officer explicitly told FWS that

19 it was to consult on "full contract amts," yet FWS failed to do

20 so.  As discussed above, "biological opinions must be

21 coextensive with the agency action."  Connor, 848 F.2d at 1457-

22 58 (9th Cir. 1988).  There is no question that ESA requires that

23 _____

24      [47]  During oral argument on April 13, 2005, the court asked
        the parties which documents were considered part of the
        administrative record.  Counsel for Federal defendants conceded
25      that internal communications between the action agency and the
        consulting agencies, including e-mails and other memorandum, were
26      to be considered part of the administrative record.

1    all impacts of agency action - both present and future effects -

2    be addressed in the consultation's jeopardy analysis.  Id.  The

3    fact that it was thought by FWS that "delivery of full contract

4    quantities is unrealistic" and that "deliveries continue to be

5    impacted by existing climate, hydrology, actions and statutes,

6    . . . socio-economic factors" does not excuse consulting on the

7    "entire agency action," which was the authorized delivery of

8    over 2.1 million acre-feet of water, and nothing less than

9    that.[48]

10       Friant defendants' attempt to excuse FWS by pointing out

11   that FWS created a mechanism whereby it would coordinate with

12   Reclamation "when the quantity of water to be delivered to the

13   contractors *exceeds the average historical deliveries* . . ."

14   (emphasis in original).[49]  BORESA 040105.  Friant Defs.' Br. at

15   36.  This argument is unavailing.  ESA mandates that biological

16   opinions must be coextensive with the action authorized, 50

17   C.F.R. § 402.02, and does not permit incremental-step

18   consultations.  Connor, 848 F.2d at 1457-58.  Because 2.1

19   million acre-feet of water was authorized by the long-term

20   contracts, FWS was required to analyze the direct and indirect

21   _____

22   [48]   The court must say it can't imagine why FWS thought the
     Bureau was contracting for double the amount the Service thought
23   was realistic, and why the Bureau insisted it wasn't kidding.

24   [49]   The BiOp explains that FWS assumed "that, if deliveries
     are to be provided in excess of the maximum historic
     deliveries identified in that Appendix D, Reclamation will
25   determine if these deliveries may affect listed or proposed species
     and/or critical habitat, and will include the Service in that
26   determination."  BORESA 040105.

1   effects of delivering 2.1 million acre-feet of water.[50]

2       Federal and Friant defendants argue that this court cannot

3   substitute its judgment for that of FWS, and that the decision

4   to analyze the average of actual water delivery amounts was

5   within FWS' discretion.  I cannot agree.

6       While it is true that ESA does not dictate any specific

7   method FWS must employ to evaluate effects, it does require

8   using a method which adequately considers the impact of the

9   action.  Selkirk Conservation Alliance v. Forsgren, 336 F.3d

10  944, 964 (9th Cir. 2003).  The question here, however, is not

11  the method the agency employed to analyze impact, but what in

12  fact was the scope of the proposed activity.

13      The scope of agency action and the proper scope of FWS'

14  review are legal questions that do not require scientific

15  expertise, as defendants suggest.  See Connor, 848 F.2d at 1453

16  (adopting D.C. Circuit test of determining adequacy of

17  biological opinion by matching the meaning of "agency action"

18  with a legal definition of term).  This court, therefore, is not

19  required to defer to the FWS.

20      Moreover, even if I were required to give deference to the

21  Agency's decision, I would still conclude that FWS violated the

22  statute because it failed to analyze the proper scope of the

---

24  [50]   Plaintiffs also object to this mechanism created by FWS
    because the trigger for further consultation is not reached until
    the Bureau delivers 1,728,582 acre-feet per year (the maximum
25  historical deliveries to the Friant Division identified in Appendix
    D), well in excess of the actual amount analyzed by FWS in its
26  BiOp.  Pls.' Br. at 41.

1   project.  In this regard, the Bureau candidly related the scope

2   of activity it sought to have authorized, and the FWS simply

3   ignored that request.  Put differently, what method FWS employed

4   to analyze the effects was irrelevant since it was not analyzing

5   the activity in question.  I conclude that FWS's decision to

6   consult on "historical annual deliveries," rather than the full

7   amount authorized by the contracts, violates ESA.[51]   50 C.F.R.

8   § 402.02, 402.14.

9       **2.   FWS' Assumption that the Bureau would Implement
        Mitigation Measures (Plaintiffs' Fifth Claim)**

10

11      In the "effects" section of their 2001 BiOp, FWS explicitly

12   relies on a list of commitments contained in the BiOp which "are

13   intended to reduce, ameliorate, or reverse effects of the Friant

14   and Cross Valley water diversions," and that FWS "assumed that

15   these measures will be effective."  FWS BORESA 040125.  The

16   conclusion section of the BiOp states that the "conclusion" [of

17   no jeopardy] is "based on the assumption that measures in this

18   biological opinion are fully implemented."  BORESA 040128.

19   Plaintiffs question FWS's reliance on the Bureau's commitments.

20   They argue that the assumption that the Bureau would follow

21   through with the commitments is arbitrary and capricious "[i]n

22

23          [51]  Plaintiffs alternatively argue that even if FWS's use of
     average historical deliveries rather than the authorized amounts
24   was lawful, FWS was at least obligated to explain why the data set
     it chose to analyze accurately represented future deliveries.
25   Pls.' Br. at 37.  Since it is clear that FWS consulted on something
     other than the full amount authorized in the water contracts, the
26   court need not engage plaintiffs' alternative argument.

1  light of the Bureau's checkered track record with conservation

2  commitments it had made as part of biological opinions on

3  earlier rounds of Friant contracts."[52]  Pls.' Br. at 47.

4      Section 7 implementing regulations require the Services in

5  assessing the likely effects of an action, to take into account

6  "effects" that are "caused by the proposed action and are later

7  in time, but still are reasonably certain to occur."  50 C.F.R.

8  § 402.02.  Mitigation measures must be reasonably specific,

9  certain to occur, and capable of implementation; they must be

10  subject to deadlines or otherwise enforceable obligations; and

11  most important, they must address the threats to the species in

12  a way that satisfies the jeopardy and adverse modification

13  standards.  Sierra Club v. Marsh, 816 F.2d 1376, 1380, 1387-88

14  (9th Cir. 1987).

15      Although plaintiffs argue that the measures set forth in

16  the BiOp "were not reasonably certain to occur," most of their

17  arguments relate to the long history of consultation involved in

18  this case, beginning in 1991, rather than to the 2001 BiOp and

19  the consultation process surrounding it.  Thus, they point out

20  _____

21      [52]  Plaintiffs also point to FWS internal documents where
    staff or officials were skeptical of the Bureau's commitments.  In
22  1999, Wayne White, the signatory of FWS' 2001 BiOP, noted that
    "[o]ur earlier [no jeopardy opinion] was based on compliance which
23  they have not fulfilled."  FWS AR 06015784.  Similarly, in 2000,
    FWS's CVPIA team noted that "[i]n past large scale, program-level
24  opinions we (the Service) have had considerable experience with BOR
    not complying with biological opinions that we have written
25  . . . .  It was apparent early on that the measures included to
    reach no-jeopardy were insufficiently funded, on reasonably long
26  time lines, or not implemented at all."  FWS AR 06018628.

1  that since 1991, the Bureau has still failed to provide FWS with

2  maps where listed species occurred, that the Bureau has still

3  failed to develop a plan to compensate for losses of endangered

4  species habitat from land conversion, and that the Bureau has

5  made limited progress on monitoring land use changes and ongoing

6  activities in the water districts.  Pls.' Br. at 47.  Indeed, in

7  their 2001 BiOp, FWS notes that the Bureau has made "limited

8  progress" or is "progressing" with some of the commitments just

9  noted.  See FWS AR 01001535, 01001537, 040022, 03005772.  As

10 stressed by defendants, however, FWS also noted that many of the

11 twenty-four commitments were being implemented, or in the

12 process of being implemented.  Plaintiffs themselves concede

13 that the Bureau has implemented some of its prior commitments

14 ("This is not to say the Bureau had done nothing with respect to

15 its prior mitigation commitments; it had.").  Pls.' Br. at 46.

16 Of the 24 or so commitments, it appears that FWS recognized that

17 the Bureau had made progress or was in the process of

18 implementing at least 20 of the commitments.  Although it is not

19 unreasonable to describe the Bureau's "track record" as

20 discouraging, I cannot conclude that the commitments made in the

21 2001 BiOp "were not certain to occur, were not capable of

22 implementation, or were unenforceable."  See Sierra Club v.

23 Marsh, 816 F.2d at 1830, 1387-88.

24     Accordingly, I cannot conclude that FWS' reliance on the

25 Bureau's commitments to implement the specified mitigation

26 measures was arbitrary, capricious, or not in accordance with

58

1  the law.

2      **3.   NMFS' Jeopardy Analysis of Spring-run Chinook**
           **Salmon and Steelhead (Plaintiffs' Sixth Claim)**
3

4          Plaintiffs challenge NMFS's jeopardy analysis of Central

5  Valley spring-run Chinook salmon and Central Valley steelhead.

6  Specifically, plaintiffs maintain that NMFS may not satisfy its

7  obligations under ESA relative to spring-run chinook and

8  steelhead by relying on its analysis of the winter-run chinook.

9  Plaintiffs also contend that defendants did not complete

10 consultation on steelhead and spring-run chinook before issuing

11 their "no jeopardy" determination in the 2001 BiOp.  The record

12 supports plaintiffs' contentions.

13     NMFS's 2001 BiOp asserted, without elaboration, that there

14 were provisions in "the winter-run biological opinion . . .

15 designed to keep emigrating winter-run chinook juvenile on the

16 northern side of the delta" which would "also minimize exposure

17 of spring run chinook and steelhead."  BORESA 041554.  In

18 another section of the BiOp, NMFS explained that "an analysis of

19 the impacts of water storage and delivery within the CVP . . .

20 on winter-run Chinook salmon can be found in the existing NMFS

21 1993 biological opinion on the CVP/SWP Operations," which is

22 "representative of effects on spring-run chinook and steelhead

23 generally and more specifically where they overlap in

24 distribution."  BORESA 041553.  Put directly, there is no

25 explanation as to why measures designed to mitigate harm to the

26 winter-run chinook would also apply to the spring-run or

1  steelhead.   If there is a scientific basis for this analysis,

2  NMFS was required to provide that explanation in its BiOp.

3  Under ESA, NMFS was required to articulate a rational connection

4  between the facts found and the decision made.  It failed to do

5  so.

6        Plaintiffs' assertion that consultation on the spring-run

7  chinook and the steelhead was not completed prior to the "no

8  jeopardy" determination is also supported by the record.   NMFS

9  explained that a 1993 BiOp which described operating criteria

10 and procedures necessary to avoid jeopardy of winter-run chinook

11 was being updated to include spring-run chinook salmon and

12 steelhead.   NMFS also explained that with regard to the spring-

13 run chinook and steelhead, it could not determine the extent of

14 "take associated with the diversion of a volume of water

15 independent of consideration of operational criteria," so "it

16 would not authorize incidental take, but would defer until

17 completion of the revised opinion on CVP/SWP operations," which

18 was expected in March 2001, after the water contracts were to be

19 signed.   BORESA 041537.   In essence, NMFS admitted in its BiOp

20 that consultation on the steelehead and the spring-run chinook

21 had not been completed even as it issued its "no jeopardy"

22 determination in its 2001 BiOp.

23      Federal defendants concede that "at the time the NMFS 2001

24 BO was issued, a consultation on the effects of CVP operations

25 on spring-run chinook and steelhead was underway" rather then

26 completed.  Fed. Defs.' Br. at 17.  They argue that this was

1  acceptable because "effects on the listed species of the
2  delivery of certain volumes of water cannot be identified and
3  isolated from the effects of the larger operational parameters
4  of the CVP."  Id.  They also contend that NMFS justifiably
5  relied on the previous BiOp issued in 1993 to address the
6  effects of CVP operations on spring-run chinook and steelhead.
7  Id.  The argument does not lie.

8      Put simply, if NMFS could not determine the extent of take
9  associated in isolation from larger CVP operations, which was
10 undergoing consultation concurrently, it was arbitrary and
11 capricious for it to issue its "jeopardy determination" on
12 steelhead and spring-run chinook before that consultation was
13 completed.  See 16 U.S.C. § 1536(d).

14      Friant defendants again argue that this BiOp was "tiered"
15 off of other BiOps, including the 2000 Programmatic BiOp.  This
16 argument, however, is unavailing since the 2001 BiOp made no
17 mention of the 2000 BiOp in its analysis and because the CVPIA
18 BiOp considered the implementation of the CVPIA, not site-
19 specific operations of the CVP.  In fact, the 2000 BiOp
20 explicitly noted that "Long-term contract renewals are subject
21 to a separate, tiered analysis . . . ."  BORESA 029563.

22      As with the winter-run chinook, Friant defendants also
23 argue that the proposed action has no effect on these species
24 because their critical habitat is not located in the action
25 area.  Regardless of whether critical habitat is designated,
26 however, an agency must consult with the Secretary where an

61

1  action will "jeopardize the continued existence" of a species.

2  16 U.S.C. § 1536(a).  The record indicates that there were

3  species of steelhead and spring-run chinook in areas that could

4  be affected by the contract renewals.[53]  Finally, Friant

5  defendants point to other passages in the 2001 BiOp which they

6  imply may be "adequate" to meet ESA's rigorous standards.

7  Friant Defs.' Br. at 21.  While the BiOp does contains other

8  passages about the steelhead trout and the spring-run chinook,

9  these passages appear to support a jeopardy finding, rather than

10 the "no jeopardy" determination issued by NMFS.[54]  For all the

11 reasons stated above, I conclude that NMFS's no jeopardy

12 determination as to the spring-run chinook salmon and steelhead

---

14    [53]    NMFS's BiOp notes that the proposed action has the
potential to affect the spring-run and steelhead because "[a]ll
15 river reaches and estuarine areas of the Sacramento-San Joaquin
Delta may be used seasonally by adult and juvenile . . . spring-run
16 chinook salmon . . . ."  BORESA 041550.  The BiOp also notes that
"evidence has been gathered over the past few years that shows an
17 extant, self-sustaining run [of steelhead] in at least the lower
reaches of the San Joaquin River."  BORESA 041551.
18
   [54]  The BiOp stated that:
19
     The diversions will continue to eliminate most of the
20   upper San Joaquin River's contributions to flows to
     assist emigration of juvenile fall-run salmon and
21   steelhead in late winter and spring months . . . .  The
     Central Valley Steelhead ESU will be affected to the
22   extent that the small portion of the ESU that is pesent
     in the San Joaquin system will continue to be precluded
23   from reoccupying the upper San Joaquin River.   The
     steelhead will also continue to experience diminished
24   flows to facilitiate immigration and emigration.  This
     effect is minimized by ongoing programs to improve
25   rearing and migration conditions . . . .

26 BORESA 041553-54.

1  is not in accordance with the law.

2      **4.   NMFS's Consultation with the Bureau on the Hidden and
        Buchanan Contracts (Plaintiffs' Sixth Claim)**[55]

3

4      According to plaintiffs, NMFS violated ESA because it

5  "never even attempted to conduct the analysis required by

6  section 7 or issue a biological opinion that addresses the

7  Hidden and Buchanan contracts."  Pls.' Br. at 54.  Once again,

8  the record supports the contention.

9      It is undisputed that the Hidden and Buchanan water units

10 are not part of the Friant Division, but provide CVP water to

11 two contractors in the Friant Division, Chowchilla Irrigation

12 District and Madera Irrigation District.  FWS AR 08023621.

13 These two Friant districts have additional contracts with the

14 Bureau for delivery of water from the Hidden and Buchanan CVP

15 units.  Pls.' SUF 13.[56]  The Hidden Unit contract provides for

16

17      [55]  In contrast to NMFS, which did not formally consult with
   the Bureau on the Hidden/Buchanan contracts, FWS did request formal
18 consultation.  Although defendants also discuss FWS's consultation
   on the Hidden/Buchanan units, plaintiffs did not address this in
19 their brief.
        An internal FWS memorandum noted that a FWS biologist "decided
20 on 1-19-01 to not include Hidden and Buchanan Unit Contracts in the
   Friant-Cross Valley Opinion due to insufficient time to make the
21 necessary changes in the project description and effects."  BORESA
   045889, 041752.  On February 1, 2001, the Bureau formally requested
22 consultation with FWS on the Hidden and Buchanan contracts.  Pls.'
   SUF 19, citing FWS AR 09024891.  On February 14, 2001, FWS issued
23 a new biological opinion for the Hidden and Buchanan contracts.
   Pls.' SUF 16.

24
        [56]  The contracts are referred to as Chowchilla Water
25 District, Buchanan Unit (Contract # 14-06-200-3844A-LTR1) and the
   Madera Irrigation District, Hidden Unit (Contract #
26 14-06-200-4020A-LTR1).  Id.

1  delivery of 24,000 acre-feet of water annually from Hensley Lake

2  to Madera Irrigation District.  The Buchanan Unit contract

3  provides for delivery of 24,000 acre-feet annually from Eastman

4  Lake to Chowchilla Water District.[57]  Friant Defs.' SUF 49,

5  citing BORESA 041538.  The renewal contracts concerning Hidden

6  and Buchanan reservoirs were executed by the Bureau on February

7  14 and 15, 2001.

8       On January 5, 2001, when the Bureau requested formal

9  consultation on the Friant contracts, there was no mention of

10  the Hidden or Buchanan water contracts.  Pls.' SUF 22, citing

11  NMFS AR 000526.  On January 26, 2001, approximately 6 days after

12  NMFS's BiOp on the Friant Division and Cross Valley Canal Unit

13  Contracts was issued, the Bureau wrote a letter to NMFS as

14  follows:

15       We have reviewed the ESA section 7 compliance
         documents for the Friant Division contracts including
16       your final biological opinion dated January 12, 2001.
         We have noted that through an apparent oversight on
17       our part, the tables provided to the you [sic] as part
         of the project description (and thus those in your
18       project description) did not include the Hidden and
         Buchanan Contracts.  However the delivery of this
19       water from H.V. Eastman and Hensley lakes is discussed
         in your project description.  In addition, we have
20       discussed this with your staff and they have confirmed
         that the delivery of the water under the Hidden and
21       Buchanan contracts and any effects of this delivery on
         species of concern were addressed in the referenced
22       biological opinion.

23  _____

24       [57]  The Hidden and Buchanan contracts pertain to deliveries
     from separate dams on separate bodies of water.  Water from the
25   Friant Division comes from the San Joaquin River at Millerton Lake
     and goes through Friant Dam, whereas Buchanan and Hidden Units
26   provide water through H.V. Eastman and Hensley Lakes and must go
     through Buchanan and Hidden Dams.  FWS AR 08023621.

1      On February 12, 2001, NMFS issued a letter in response to

2 the Bureau's request, asserting that NMFS did, in fact,

3 "consider the effects of the Hidden and Buchanan contracts in

4 the Biological Opinion issued to the Bureau on January 20,

5 2001."[58]  Pls.' SUF 19, citing NMS AR 0008881, et seq., NMFS AR

6 000915, Pls.' SUF 50, NMFS AR 000884, 000885, 000913, 000915.

7 Consequently, the Bureau did not request formal section 7

8 consultation from NMFS on the Hidden and Buchanan contracts.

9 Pls.' SUF 52, citing NMFS AR 000526-27, 000885, 000881.  No

10 biological opinion was ever issued by NMFS on the Buchanan and

11 Hidden units. Id.

12      Plaintiffs urge a violation of ESA because they claim that

13 no consultation was ever completed on the Hidden and Buchanan

14 contracts before they were signed.  Alternatively, plaintiffs

15 argue that the BiOp is invalid as to the Hidden and Buchanan

16 contracts because its analysis on these water districts fails to

17 comply with ESA's rigorous standards.  Pls.' Br. at 55.

18      The Bureau's letter to NMFS, after the January 20, 2001

19 BiOp was issued, noted that through an "apparent oversight on

20 [its] part," the tables provided to NMFS as part of the project

21 _____

22      [58]  The letter reads, in pertinent part:

23      This is to confirm, in response to your letter of
        January 26, 2001 to Dr. Rebecca Lent, that the National

24      Marine Fisheries Service did consider the effects of the
        Hidden and Buchanan Contracts in the Biological Opinion

25      issued to the Bureau of Reclamation on January 20, 2001.
        No further consultation on those contracts is necessary

26      . . . .

1  description did not include the Hidden and Buchanan units.

2  Furthermore, in the cover letter that was attached to its 2001

3  BiOP (written to the Bureau), NMFS explicitly stated that the

4  letter transmits the BiOp on the long-term renewal of the water

5  contracts "for the Friant Division and Cross Valley Canal Unit

6  Contractors," and there is no mention of the Hidden or Buchanan

7  water units.  Moreover FWS, in contrast to NMFS, did request

8  formal consultation on these two units because they concluded

9  that they could not include analysis of the Hidden and Buchanan

10  units "due to insufficient time to make the necessary changes in

11  the project description and effects."  FWS AR 09024885.

12      Defendants' contention that the analysis covered these two

13  contracts is also undermined by the fact that there exists

14  internal correspondences from the Bureau which explicitly

15  acknowledges that it did not request consultation on Hidden and

16  Buchanan due to a mistake on its part.  An e-mail from Frank

17  Michny of the Bureau to an FWS scientist, Cay Goude, admitted

18  that there was a "glitch" in the consultation "in that Hidden

19  and Buchanan contracts were not in project description" and that

20  "[t]his has become a big issue . . . ."  The Bureau recognized

21  that it did not provide the information required for the

22  consulting agencies to even consider the effects of the Hidden

23  and Buchanan units in its BiOps.  FWS AR 09024886.  Mr. Goude

24  was alarmed enough to forward that e-mail on to other scientists

25  working on the FWS BiOp, with one sentence which reads, "what

26  should we do.  help.  cay."  FWS 09024886.

1       Despite all the above, the Friant and Federal defendants
2  insist that NMFS did consider the effects of Hidden and Buchanan
3  in their Friant Division/Cross Valley Canal Unit January 2001
4  BiOp.  Defendants cite to a myriad of charts and discuss various
5  figures supossedly in support of that contention.

6       First, Friant defendants argue that the Hidden and Buchanan
7  units were considered in NMFS's January 2001 BiOp because there
8  is one sentence in the BiOp which states that "2 contractors in
9  the Friant Division also receive water from H.V. Eastman Lake
10  and Hensly Lake."  BORESA 041538.  This sentence, in and of
11  itself, is hardly convincing evidence that the Hidden and
12  Buchanan contracts were analyzed in the effects section.  Both
13  defendants also point to an inconsistency in the contract
14  entitlement numbers contained in two places in the BiOp.  They
15  note that the "proposed action" section of the BiOp states that
16  "Entitlements are 737,500 for Class 1 Water and 1,387,475 for
17  Class 2 for Friant Division."  On the next page, they point out
18  to Table 1, which lists the "water entitlements for the Friant
19  Division,", as showing for Class 1 692,802 and 1,149,477 for
20  Class 2.  BORESA 041537-041539.  Friant and Federal defendants
21  argue that this discrepancy of 282,695 acre-feet between the
22  water delivery amount listed in the chart and that described in
23  the "proposed action" of the BiOp reflect that the Hidden and
24  Buchanan units were, in fact, considered.  They maintain that
25  this substantial difference is more than enough to cover the
26  48,000 acre-feet that was delivered from Hidden and Buchanan.

67

1  As I now explain, the argument is not persuasive.

2      First, accepting defendants' arguments about the

3  discrepancy in the numbers would require the court to make

4  inferences about the consultation process which simply are not

5  supported anywhere in the BiOp.  As the court has noted

6  previously, "we cannot infer an agency's reasoning from mere

7  silence," and that "in considering the BiOps, we may only rely

8  on what the agency said in the record to determine what the

9  agency decided and why."  Gifford Pinchot, 378 F.3d at 1072

10  (citing Reno v. Shalala, 30 F.3d 1057 (9th Cir. 1994)).  Because

11  the BiOp nowhere reflects that the effects of the Hidden and

12  Buchanan units was considered, the court cannot accept

13  defendants' arguments.  Secondly, plaintiffs compellingly note

14  that Table 1, which lists the "water entitlements for the Friant

15  Division," according to the 2001 BiOp, is identical to the chart

16  on Appendix D contained in FWS's 2001 CVPIA BiOp ("Mother

17  Opinion,"), which lists the water deliveries for all CVP

18  contractors.  The numbers listed under Friant Division for the

19  Madera and Chowchilla districts from Appendix D match exactly

20  the water delivery amounts contained in Table 1 of NMFS's 2001

21  BiOp.  In both tables, "maximum annual delivery" for Madera

22  Irrigation District is 213,500 and "maximum annual delivery" for

23  Chowchilla Water District is 168,709.  The last page of Appendix

24  D identifies additional "maximum annual deliveries" from

25  "miscellaneous" units, including 24,000 for Chowchilla Water

26  District from Buchanan Unit and 24,000 acre-feet for Madera

1   Irrigation District from the Hidden Unit.  FWS AR 06020481.

2       Based on the actual content of the administrative record,

3   defendants' post hoc argument that NMFS did, in fact, consider

4   the impacts of the Hidden and Buchanan contracts in its Friant

5   BiOp cannot be accepted.  Because it appears that the Bureau

6   never consulted on these two units before signing the contracts

7   in February, they are in violation of ESA's mandate that

8   consultation must be complete as to the entire project before

9   the action is initiated or any of its components undertaken.

10  See Conner, 848 F.2d at 1453; Lane County Audubon Soc'y v.

11  Jamison, 958 F.2d 290, 295 (9th Cir. 1992).

12  **D.    THE BUREAU OF RECLAMATION'S LIABILITY UNDER ESA**
        **(PLAINTIFFS' FOURTH CLAIM)**

13

14      Plaintiffs allege that the Bureau committed resources

15  before completing ESA section 7 Consultation (plaintiffs' fourth

16  claim).[59]  As discussed above, because NMFS did not issue a BiOp

17  on the Hidden and Buchanan contracts in its consultations on the

18  Friant contracts before executing the contracts, the Bureau

19  violated Section 7(d) of the Endangered Species Act.

20      Plaintiffs also argue that the Bureau violated ESA by not

21  independently ensuring that its own actions do not cause

22  ───────────────

23      [59]  Te section provides:

24      the Federal agency . . . shall not make an irreversible
        or irretrievable commitment of resources with respect to
        the agency action which has the effect of foreclosing
25      the formulation or implementation on of any reasonable
        and prudent alternative measures which would not violate
26      subsection (a)(2) of this section.

69

1  jeopardy to listed species or adverse modification to species

2  and their habitat.  Defendants, on the other hand, contend that

3  the BiOps were not unlawful and the Bureau's reliance on them

4  was reasonable.

5      The Ninth Circuit has previously addressed situations in

6  which a consulting agency issued a faulty "no jeopardy" opinion

7  and the action agency adopted it.  No bright line test emerges

8  from those cases, but the Circuit has concluded that an action

9  agency may not escape its responsibility under the Endangered

10 Species Act by simply relying on the consulting agency's

11 analysis.  See Resources Ltd., Inc. v. Robertson, 35 F.3d 1300,

12 1304 (9th Cir. 1994); Pyramid Lake Paiute Tribe v. United States

13 Dept. of Navy, 898 F.2d 1410, 1415 (9th Cir. 1990) ("A federal

14 agency cannot abrogate its responsibility to ensure that its

15 actions will not jeopardize a listed species . . . .").  On the

16 other hand, the Circuit has also concluded that an action agency

17 need not undertake a separate, independent analysis in the

18 absence of new information not considered by the consulting

19 agency in reaching its "no jeopardy" conclusion.  See Stop H-3

20 Ass'n v. Dole, 740 F.2d 1442, 1460 (9th Cir.1984).  In some

21 circumstances, the court has required the party bringing this

22 claim to "put forth new information which the consulting agency

23 did not take into account in rendering its opinion."  See

24 Pyramid Lake Paitue Tribe, supra.  Finally, the Circuit has also

25 upheld an action agency's adoption of a "no jeopardy" finding

26 even when based on admittedly "weak" best available evidence.

1  See Greenpeace Action v. Franklin, 14 F.3d 1324, 1336 (9th Cir.
2  1993).

3      Despite what appears to be somewhat conflicting holdings,
4  all of the cases hold that the action agency may be liable if
5  its reliance on the consulting agency's analysis was arbitrary
6  or capricious.  As I now explain, the record demonstrates that
7  the Bureau's renewal under the circumstances was arbitrary and
8  capricious.

9      While numerous examples may be found, see Pls.' Br. at
10  58-60, perhaps the clearest instance of arbitrary conduct was
11  when the Bureau, knowing that FWS based its analysis on less
12  than the full contract amount, nevertheless, adopted a "no
13  jeopardy" finding.  Having knowledge that FWS did not analyze
14  the action authorized, the Bureau had no reasonable basis to
15  rely on FWS's BiOp in order to bypass its own responsibility to
16  ensure that the federal action would not jeopardize listed
17  species and critical habitats.  See Pyramid Lake, 898 F.2d at
18  1415.  Because the Bureau failed to carry out its duty to ensure
19  against jeopardy and adverse modification, and because the
20  Bureau knew of the deficiency, the court must conclude that its
21  conduct was arbitrary and capricious.
22  ////
23  ////
24  ////
25  ////
26  ////

1  **E.    REINITIATION OF CONSULTATION (PLAINTIFFS' FOURTH, FIFTH,**
       **AND SIXTH CLAIMS)**
2

3        Plaintiffs' final argument is that Federal defendants were

4  required to reinitiate consultation.[60]  Plaintiffs argue that a

5  2002 decision issued by Judge Wanger constituted "new

6  information" that gave rise to a duty to reinitiate consultation

7  on the long-term renewal of the Friant contracts, because it may

8  "affect listed species or critical habitat in a manner to an

9  extent not previously considered."  Plaintiffs explain that in

10  February 2001, at the time the long-term contracts were signed,

11  the Bureau of Reclamation was under a duty, under Section

12  § 3406(b)(2) of the CVPIA, to dedicate and manage annually

13  ////

14  _____

15        [60]  Reinitiation of formal consultation is required and shall
    be requested by the Federal agency or by the Service, where
    discretionary Federal involvement or control over the action has
16  been retained or is authorized by law and:

17        (a) If the amount or extent of taking specified in the
        incidental take statement is exceeded;
18

19        (b) If new information reveals effects of the action that may
        affect listed species or critical habitat in a manner or to
        an extent not previously considered;
20

21        (c) If the identified action is subsequently modified in a
        manner that causes an effect to the listed species or
        critical habitat that was not considered in the biological
22        opinion; or

23        (d) If a new species is listed or critical habitat designated
        that may be affected by the identified action.
24        50 C.F.R. § 402.16.

25  See Environmental Protection Information Center v. The Simpson
    Timber Co., 255 F.3d 1073, 1076 (9th Cir. 2001).
26

800,000 acre-feet of CVP yield for environmental purposes.[61]  In
February 2002, a year after the contracts were signed, Judge
Wanger issued an order which prohibited the Department of
Interior from using offset/reset matrices in accounting for use
of water under § 3406(b)(2), to impermissibly alter the 800,000
acre feet of designated water by Congress.  See San Louis &
Delta-Mendota Water Auth. v. United States, CIV F-97-6140 OWW,
Supp. Mem. Dec. and Order Re: Summ. Judg. Mot. at 15-17 (Feb. 5,
2002).  The Ninth Circuit affirmed that ruling in Bay Institute
of San Francisco v. United States, aff'd in part, rev'd in part
on other grounds, 87 Fed. Appx. 637 (9th Cir. 2004).

Plaintiffs contend that complying with Judge Wanger's
ruling would have the effect of diminishing the fish protection
flows from CVPIA(b)(2) by approximately 400 TAF (thousand acre
feet), and that "there is no question that reduction for several
hundred thousand acre-feet in annual flows 'may affect listed
species or critical habitat in a manner or to an extent not
previously considered.'"  Pls.' Br. at 62, citing Friant Defs.'
Motion to Augment the Record, Ex. 3, at 5.[62]  Friant defendants,

---

[61]  Section 3406(b)(2) provides that the "primary purposes" to
which the 800,000 acre feet may be used to "help" meet obligations
under the Endangered Species Act and to "assist" in meeting water
quality standards.

[62]  As NMFS explains in one of the documents relied on by the
Friant defendants:

> In 2002 [spring-run/steelhead] OCAP opinion,
> Reclamation was assumed to operate the CVP
> using the October 1999 Federal court decision
> on implementation of CVPIA b(2) flows.

1  on the other hand, argue that the Bureau and the consulting

2  agencies have already reinitiated consultation on the renewal of

3  the Friant Division contracts, but the documents they cite do

4  not support that proposition.[63]  Friant defendants alternatively

5  argue that once the contracts were executed, Reclamation lost

6  its discretion to amend them to address the needs of threatened

7  or endangered species.

8  During oral argument, both Friant and Federal defendants

9  explained that Judge Wanger's decision relates to the entire

10  operation of the CVP, and that the decision may not specifically

11  affect the water units at issue in this litigation.  Friant

12  _____

13              Beginning in 2001, however, Federal court
             rulings have . . . disallowed the use of
14              offset and reset rules (i.e., crediting) on
             reservoir storage and Sacramento-San Joaquin
15              Delta pumping. Compliance with these rulings
             has the effect of diminishing the fish
16              protection flows from CVPIA (b)(2) by
             approximately 400 TAF [thousand acre feet].

17

18  Friant Def.'s Mot. to Augment to Admin. Record at Ex. 3, p. 5
(October 7, 2004).

19      [63]  Friant defendants first cite to the long-term OCAP BiOp on
CVP operations issued by the FWS on July 30, 2004.  Friant
20  Defendants' Motion to Augment, Ex. 2, p. 23.  Although there is a
section in that BiOp which briefly mentions Section 3406(b), it
21  clearly was not a BiOp that was written in response to a request
for reinitiation on the Friant contracts.  Rather, the BiOp was a
22  request for formal consultation on the Operating Criteria and Plan
in California (OCAP), operations of the CVP, and operations of the
23  State Water Project (SWP).  They also assert that defendants have
reinitiated consultation, citing to a request for consultation on
24  the renewal of interim contracts (for the period April 1, 2004 -
March 31, 2006).  This interim BiOp does not cover the effects of
25  the twenty-five year Friant contracts and cannot be considered an
effort on the part of the Bureau to reinitiate consultation on the
26  Friant contracts.  Friant Defendants' Motion to Augment, Ex. 3.

74

1  defendants explained that the decision "might" impact the

2  Friant, Buchanan, and Hidden deliveries, but that the water may

3  come from other divisions as well.  Plaintiffs, however, contend

4  that since it is unclear exactly what the impacts are,

5  reinitiation is required so NMFS can consider what the impacts

6  are, and whether the Friant contracts still meet the no jeopardy

7  and no adverse modification standard under ESA.

8      Under ESA's implementing regulations, "[i]f new information

9  reveals effects of the action that may affect listed species or

10 critical habitat in a manner or to an extent not previously

11 considered," reinitiation of formal consultation is required.

12 50 C.F.R. § 402.16.  Thus, the issue appears not to be whether

13 it can be determined with certainty that Judge Wanger's decision

14 would affect the units at issue in this litigation.  So long as

15 new information reveals that the decision "may" affect listed

16 species, reinitiation of consultation is required under ESA.

17 Nonetheless, as I explain below, I agree with defendants that

18 reinitiation was not required.

19     As Friant defendants maintain, reinitiation of consultation

20 can only happen where "discretionary Federal involvement or

21 control over the action has been retained or is authorized by

22 law."  50 C.F.R. § 402.16; see Environmental Protection

23 Information Center v. Simpson Timber Co., 255 F.3d 1073 (9th

24 Cir. 2001).

25     Unfortunately, the parties provide no help in resolving

26 whether under the contracts the federal government retained the

1  power to amend for environmental protection.  Plaintiffs fail to
2  address the issue, and the Federal defendants' brief is
3  completely silent on the issue of reinitiation of consultation.
4  Finally, the Friant defendants misread <u>Environmental Protection</u>
5  <u>Information Center</u> to hold that "[o]nce the renewal contracts
6  were executed, Reclamation lost its discretion to amend them to
7  address the needs of threatened or endangered species."  Friant
8  Defs.' Br. at 57.  To the contrary, in <u>Environmental Protection</u>
9  <u>Information Center</u>, the court examined the permit to determine
10 whether discretion had been retained.  In like manner, this
11 court must examine the contract to determine the scope of
12 discretion, if any, retained by the Government.
13     Equally unfortunate, none of the parties have directed the
14 court to the appropriate passage(s) in the water contracts which
15 would allow the court to determine whether a specific
16 contractual provision provided discretionary power on the part
17 of the services to demand additional measures to protected
18 listed species or their critical habitat.
19     Upon the court's own examination of the Friant, Hidden,
20 and Buchanan water contracts, the court concludes that while
21 there are some provisions of the contract which allow for
22 discretion as to how much water may be delivered, none of those
23 provisions specifically relate to measures to protect endangered
24 species.  For instance, Article 11(b) of the contracts recites
25 that water "may temporarily be discontinued or reduced to
26 provide for purposes of investigation, inspection, maintenance,

76

1   repair or replacement of any of the Project facilities."  <u>See</u>

2   Admin. Record and Other Non-Case Material Cited in Friant

3   Defendants' Re-filed Summary Adjudication Briefs, Volume 9 of

4   10, Tabs 33 (Chowchilla Renewal Contract, exemplar for Friant),

5   36 (Hidden Contract), and 37 (Buchanan Contract).  Article 12 of

6   the contracts also allows for some flexibility in the amount of

7   water delivered to the contractors if there is a shortage in the

8   quantity of water.  Put directly, these contractual provisions

9   do not specifically address whether the Services have the power

10  to reinitiate consultation to protect listed species or critical

11  habitat, and indeed listed species and their critical habitat

12  are not mentioned in any of these "discretionary clauses."

13      <u>Environmental Protection Information Center</u> noted that even

14  though various permit documents discuss some control that FWS

15  may have had to implement conservation measures, none of the

16  measures specifically addressed the scope of FWS's authority to

17  implement measures to benefit species other than the spotted

18  owl. 255 F.3d at 1079-1084.  The holding suggests that the case

19  contemplates very specific language in permits or contracts

20  explicitly retaining discretionary control to benefit protected

21  species and their critical habitat.  Such language appears to be

22  absent from the contracts at issue.  Accordingly, plaintiffs'

23  motion for summary judgment is denied as to this issue, and the

24  Friant defendants' motion is granted.

25  ////

26  ////

1                                    **IV.**

2                        **CONCLUSIONS AND ORDERS**

3        For all the foregoing reasons, the court hereby ORDERS as

4   follows:

5        1.  Plaintiffs' motion for summary adjudication on the

6   critical habitat inquiry is GRANTED (Plaintiffs' Sixth Claim,

7   ¶ 170; Plaintiffs' Fifth Claim, ¶¶ 164, 167).

8        2.  Plaintiffs' motion for summary adjudication on the

9   jeopardy analysis is GRANTED (Plaintiffs' Fifth Claim, ¶ 165;

10  Plaintiffs' Sixth Claim, ¶¶ 171-173).

11       3.  Plaintiffs' motion for summary adjudication as to the

12  Bureau of Reclamation's liability is GRANTED (Plaintiffs' Fourth

13  Claim, ¶¶ 152-156, 158, 161).

14       4.  Defendants' motion as to reinitiation of consultation

15  is GRANTED (Plaintiffs' Fourth Claim, ¶ 160; Fifth Claim, ¶ 168;

16  Sixth Claim, ¶ 174).

17       IT IS SO ORDERED.

18       DATED:  July 28, 2005.

19
                                    /s/Lawrence K. Karlton
20                                  _____
                                    LAWRENCE K. KARLTON
                                    SENIOR JUDGE
21                                  UNITED STATES DISTRICT COURT

22

23

24

25

26

                                    78